[Cite as *State v. Robinson*, 2014-Ohio-3645.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                  :        C.A. CASE NO.   2013 CA 69

v.                                          :        T.C. NO.   12CR816

TRAVIS ROBINSON                             :      (Criminal appeal from
                                         Common Pleas Court)

    Defendant-Appellant                 :

                                            :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    22nd    day of     August    , 2014.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

ADRIAN KING, Atty. Reg. No. 0081882, P. O. Box 302, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

{¶ 1} Travis Robinson appeals from a judgment of the Clark County Court

of Common Pleas, which found him guilty following a bench trial of one count of rape; no

presentence investigation was conducted, and the court sentenced Robinson to five years in prison and designated him a Tier III sex offender.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} In December 2012, Robinson was indicted on one count of rape in violation of R.C. 2907.02(A)(1)(c), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * * The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."

{¶ 4} Pursuant to the bill of particulars, Robinson was accused of "insert[ing] his penis into the victim's mouth while she was unconscious" due to intoxication. Robinson had videotaped the incident on his cell phone, which was later found by the complainant. Robinson's pre-trial motion to suppress the video was denied, and he does not challenge that decision on appeal.

{¶ 5} The identities of the persons and the act depicted in the video were not disputed at trial, nor was the complainant's unconsciousness. However, the circumstances surrounding the creation of the video and Robinson's understanding of the complainant's "consent" were disputed.

{¶ 6} Robinson and the complainant, A.P., dated for more than two years and had a sexual relationship throughout that time. They did not live together. Robinson had cheated on A.P. several times and had given her sexually transmitted diseases. Nonetheless,

she envisioned a future with him, including children, and she testified that Robinson was like a father to her young child. A.P. was very possessive of Robinson and became very upset when she suspected him of cheating.

{¶ 7} The alleged rape occurred on the night of November 10-11, 2012, at the complainant's residence in Springfield. According to A.P., she, Robinson, and a couple of friends were drinking hard liquor and smoking marijuana in her bedroom. A.P. did not know how many shots of liquor she had consumed, but she said that it was "a lot," and she "hadn't had any sleep." A.P. and Robinson got into a physical and verbal fight, as they frequently did, about Robinson's cheating on A.P. The friends broke up the fight and then left.

{¶ 8} According to A.P., she and Robinson had not had sexual intercourse of any kind earlier in the evening and had not discussed doing so. She was very drunk, and she does not remember any events from the time the friends departed until she awoke when Robinson burned her on her "butt" with a cigarette. It was still dark outside at this time. She jumped off the bed and began to yell at Robinson, and then noticed that she "didn't have any pants on" or underwear. (She had been dressed when she passed out or fell asleep.) They renewed their fight, which was again broken up by others in the house. A.P. did not know how long she had been unconscious, but she testified that she was still intoxicated when she awoke and resumed her fight with Robinson. Robinson then left, and A.P. went back to sleep.

{¶ 9} A.P. estimated that she slept until about 10 a.m. Shortly thereafter, she looked under her bed for her shoes and began to receive phone calls from Robinson, who

was looking for his missing phone. A.P. found the phone under her bed. A.P., with her friend and housemate, J.J., began to look through the phone for evidence of Robinson's cheating. She discovered that the most recent video depicted her, wearing the clothes she had worn the previous day, unconscious, with Robinson's penis in her mouth. She became very upset.

{¶ 10} Although J.J. and his father urged A.P. to go to the police, she did not immediately do so; she testified that she loved Robinson and wanted to work things out with him. A.P. testified that she cried all day and, when she went to work that night, she was too upset to work. She told some co-workers what had happened, and they also encouraged her to go to the police. She went to the police department and then to the hospital, where a rape kit was completed.

{¶ 11} A.P. acknowledged having called some of the women whose numbers she found on Robinson's phone to ask if they were sleeping with Robinson. (One of the women testified that she had received such a call on November 11 or 12, 2012.) A.P. also acknowledged that, after looking at Robinson's phone, she was very angry, both about the video and about his cheating. She stated that she and Robinson had never previously recorded their sexual activities or talked about doing so.

{¶ 12} On cross-examination, A.P. stated that she and Robinson had fought frequently, including physical altercations, because of her anger about his cheating, including "with underage girls." She admitted that she had confronted some of these women and/or girls. She also acknowledged that she had cheated on Robinson herself, so he would know how she felt.

{¶ 13} A.P. was questioned about letters she had written to Robinson when he was in jail prior to the rape on another charge. She admitted that, in the letters, she had "probably" mentioned getting a camera to take "sexual pictures" of herself. They had also talked about A.P.'s taking pictures for Robinson (before November 2012) in which she was clothed in panties and a bra, or showing her feet and nylons, because he was "obsessed" with those things, and she was familiar with his interests because they had been in a relationship for more than two years.

{¶ 14} A.P. further stated that, after she was burned by Robinson and discovered her partial state of undress, she "thought maybe [she and Robinson] had had sex," but she was not upset about this possibility until she saw the video. A.P. testified that she would have done "anything sexually" with Robinson, if she had been awake, and would have performed oral sex when she awoke if he had wanted her to do so, but that she had not given Robinson permission to have sex with her when she was unconscious. She also acknowledged that Robinson had told her in the past that he had "raped" her when she was asleep, but that she had not believed him.

{¶ 15} Springfield Police Officer Matthew Parr met with A.P. when she came to the police station on November 12, 2012. He testified that she was "upset" and "embarrassed." Parr testified that he observed bruises on A.P.'s body and marks and scratches on her neck, consistent with her accounts of recent physical altercations with Robinson. (Parr did not mention burn marks in his testimony.) Parr also watched the video on the phone presented by A.P., which depicted the complainant "unconscious or passed out in some regard and a male inserting his penis in her mouth." A.P. identified Robinson as the perpetrator and owner of the phone. Parr sent A.P. to the hospital and went to Robinson's house himself,

where Robinson was arrested on a single charge of rape.

{¶ 16}    Robinson also testified about the events of November 10-11, 2012 and the history of his relationship with A.P.   Robinson admitted that he had seen other women during his relationship with A.P., but he denied that any of them were minors.   Robinson stated that A.P. was very jealous and became "violently angry" when she suspected him of cheating.   Robinson also testified that, throughout their relationship, he and A.P. had vaginal and oral sex "almost every time [they] met up," often involving alcohol and drugs, and that A.P. had never said no to sex.

{¶ 17}    Robinson stated that, on the evening in question, he, A.P. and some friends had been drinking a "dark alcoholic liquor" called Paul Masson and Budweiser; the drinking had begun before he arrived, but he joined in.   He testified that he smelled, but did not see, marijuana, and that he also saw A.P. with cocaine and pills, but did not see her ingest them.   Robinson stated that he and A.P. went to her bedroom at her initiative, played video games for 15 to 20 minutes, and then A.P. asked if he "wanted to f***."[1]   A.P. proceeded to engage in fellatio "for about five minutes," but then she "just stopped," and Robinson saw that she was "sleeping."   Robinson "grabbed [his] phone and recorded a 25 or 30 second video * * * to show her the following day that this incident had transpired because in the past the same thing had happened and she never believed me."

{¶ 18}    According to Robinson, A.P. woke up 15 to 20 minutes later when Robinson pinched her on the leg.   (Robinson denied burning A.P. with a cigarette; although he

_____

[1] Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

smoked, he denied that he even had cigarettes with him on the night in question.) A.P. was very angry when she awoke and accused Robinson of burning her. She also tried to take back the shirt he was wearing, which she had given to him. According to Robinson, A.P. grabbed a cracked CD and swung it at him, puncturing his hand.

{¶ 19} Robinson testified that A.P. had been awake when the fellatio started and had passed out or fallen asleep during the act. He also reiterated that A.P. had passed out during sex numerous times in the past, and that she had initiated oral sex in the past while he was sleeping. A.P. texted Robinson the word "rapist" the following morning, but he claimed he was confused and did not realize he had done anything wrong.

{¶ 20} Robinson admitted that when he was confronted and interviewed by the police, he had initially told several lies, including that he had broken up with A.P. months earlier and had not seen her, that he was not the man in the video, and that he was being "set up" by A.P. Later in the interview, he admitted that he had been "scared" and "in a state of denial" and told the police the "somewhat" more truthful account that A.P. had asked to have sex and had asked Robinson to record it. Robinson maintained that A.P. had "fallen asleep" or had been "coked out," rather than "passed out." At the end of the interview, Robinson agreed with the police officers that the video "looked bad," but he testified that he had agreed with them on this point "just to end the interview."

{¶ 21} The trial court found Robinson guilty of rape, a felony of the first degree; it sentenced him to five years in prison, classified him as a Tier III sex offender, imposed a mandatory five-year term of postrelease control, and ordered him to pay all costs and fees permitted by law.

**{¶ 22}** Robinson raises two assignments of error on appeal, which we address in an order that facilitates our discussion.

**{¶ 23}** The second assignment of error states:

> **The court's verdict should be reversed as against the manifest weight of the evidence.**

**{¶ 24}** Robinson contends that "reasonable doubt exists with regard to the mens rea" because he believed that A.P. had consented to his sexual acts with her, because she had invited him "to f***," had had "sex with him on a constant basis," had never refused to have sex with him, and had been conscious when the sex began. Also, when he had told her in the past that they had engaged in sex while she was unconscious, she had not believed him but also had not objected. Therefore, he claims that he had "no reason to believe that he could not finish what they had started."

**{¶ 25}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 2. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 26}    Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses.  *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).    The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 27}    Robinson's argument is based on his version of events, which was contradicted by A.P.   Although she was unconscious, and therefore could not provide a full account of events, she denied that she had ever consented to having (or finishing) sex while she was unconscious.   Moreover, even if it had occurred previously, Robinson acknowledged that A.P. had not believed his claims to that effect.   The trial court could have reasonably concluded that her failure to believe or to "object" to such an assertion in the past did not amount to consent.   Further, according to A.P., her incapacitation began prior to any sexual activity, as the last event she remembered was the departure of her friends.

{¶ 28}    The testimonies of Robinson and of A.P. contain some inconsistencies and some uncorroborated claims.   However, A.P. testified that she had not consented to having sex when she was unconscious, and her inability to consent in that state was apparent.   The trial court did not clearly lose its way or create a manifest injustice when it found Robinson guilty of rape.

{¶ 29}    The second assignment is error is overruled.

{¶ 30}    The first assignment of error states:

**Mr. Robinson should be granted a new trial because he was denied effective assistance of counsel when the trial [court] appointed counsel only one business day before trial.**

{¶ 31} Robinson claims that "no attorney could have effectively defended him" when there was so little time between counsel's appointment and trial. He argues that prejudice should be presumed under these circumstances.

{¶ 32} We review alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.*

{¶ 33} Robinson was initially represented by an attorney from the public defender's office. On May 3, 2013, that attorney filed a motion to withdraw, asserting a conflict of interest, because one of the witnesses disclosed by the State was also represented by the public defender's office. On May 6, the trial court held this motion "in abeyance" to see if the witness would appear, and the trial was continued by agreement of the parties. The trial was scheduled for July 15, 2013.

{¶ 34}   On Thursday, July 11, 2013, Robinson appeared before the court and waived his right to a jury trial.  There had been no further entries into the record with respect to Robinson's representation, but he was represented at the jury waiver by Darnell Carter (an attorney not associated with the public defender's office).   At trial on July 15 (a Monday), the prosecutor stated that Carter had been appointed the previous Thursday (the day of the jury waiver), and no one disputed this fact.

{¶ 35}   In the preliminary remarks, the prosecutor noted that Carter "had a very brief period of time to prepare for trial."   Thereafter, Carter stated that he was prepared to go forward, and Robinson stated that he did not have any reservations about Carter's representing him at trial that day.  The record also reveals that, on the day of trial, the State sought a continuance, because one of its witnesses was not present, and Robinson's attorney opposed this motion.

{¶ 36} The prosecutor stated that, although Carter was not counsel of record throughout the proceedings, he had been in contact with the prosecutor "when this matter was first indicted," inquiring "as to the nature of the charges and the evidence against" Robinson. The prosecutor also stated her belief that Carter had met with Robinson "on multiple occasions over at the jail," but acknowledged that she did not know the content of their conversations.  Defense counsel did not elaborate on any of his conversations with Robinson and did not seek a continuance; the case proceeded to trial without objection.

{¶ 37} Although the time between counsel's acknowledgment as the attorney of record and the trial was very short, counsel had previously been aware of and involved in the case to some degree, and there is no basis to conclude that counsel was not prepared to

proceed on the day of trial. Counsel affirmatively stated that he was ready to proceed. Under these circumstances, the trial court did not abuse its discretion in proceeding to trial.

{¶ 38} Moreover, Robinson has not demonstrated that his trial counsel's conduct fell below an objective standard of reasonableness and that counsel committed any errors serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. As far as we can tell from the record, counsel presented Robinson's defense very competently, including effective cross-examination of the State's witnesses. Robinson asserts on appeal that Carter "later indicated that he obtained information at trial that would have changed his trial strategy;" however, Robinson has not indicated what the information was, whether it would have been obtained before trial even if counsel had more time, or how the strategy would have changed.

{¶ 39} The first assignment of error is overruled.

{¶ 40} The judgment of the trial court will be affirmed.

. . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissenting:

{¶ 41} I disagree. In my view, the egregious circumstances surrounding the trial court's appointment of counsel justify a presumption of ineffective assistance of counsel. The very first thing newly appointed counsel did, prior to obtaining discovery, was advise the trial court within moments of his appointment that Robinson would waive his right to jury trial! The prosecuting attorney noted, "we'll make sure that discovery is available to

Mr. Carter." Immediately thereafter, the jury waiver was executed without benefit of review of discovery. This cannot be characterized as effective representation, when there has been no opportunity yet to evaluate the strength of the State's case, the wisdom of waiving a jury, and a discussion of all possible defenses with Robinson.

{¶ 42} Under *Cronic v. U.S.*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct 55, 77 L.Ed. 158 (1932), prejudice must be presumed when an individual is not accorded the right to counsel in any meaningful sense where it is apparent that counsel did not have sufficient time to engage in thorough ongoing investigation and preparation. In my view it is wholly unreasonable to suggest or conclude that even the most talented, experienced defense attorney can prepare a first degree felony rape trial in three days. (Two of those three days were over the weekend, which no doubt limited access to witnesses, especially those in law enforcement). Robinson's situation fits squarely under the third prong of *Cronic* wherein the court noted that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Id.* at 659-60.

{¶ 43} The court was aware of the public defender's conflict of interest for over two months prior to the reset jury trial, yet it did not rule on the public defender's motion to withdraw until the eleventh hour, while precious investigation and preparation time dissipated. This delay is inexcusable and unreasonable. Those two months would have provided the new attorney a meaningful opportunity to investigate the case, interview witnesses, develop a theory of defense, prepare the defendant for testifying and, oh yes, determine if a jury waiver would be beneficial to Robinson in any respect.

**{¶ 44}** In my view, Robinson was denied his Sixth Amendment right to counsel, given the inexplicable delay in change of counsel, immediate jury waiver, and ridiculously brief period of time between appointment and trial. While "the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial," the Court has recognized that "the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel." *Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940). I would reverse for a new trial to provide new counsel a meaningful opportunity to discharge his duties, which would also permit Robinson to have his case fairly considered by twelve impartial jurors. This is a highly fact sensitive case. I would reverse and remand.

. . . . . . . . . .

Copies mailed to:

Ryan A. Saunders
Adrian King
Hon. Douglas M. Rastatter