[Cite as *State v. Wiley*, 2012-Ohio-512.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE   COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2011-CA-8 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 10-CR-133 |
| v. | : | |
| | : | |
| RONNIE L. WILEY | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of February, 2012.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty. Reg. #0020615, and DEBORAH S. QUIGLEY, Atty. Reg.
#0055455, Darke County Prosecutor's Office, Darke County Courthouse, 3rd Floor, 504 South
Broadway, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee

NICOLE L. HARRISON, Atty. Reg. #0086301, Goubeaux & Brand, Post Office Box 158,
Greenville, Ohio 45331
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

    {¶ 1}   Ronnie Wiley appeals his convictions on three drug-related charges. A jury

found Wiley guilty of illegal assembly or possession of chemicals for the manufacture of

drugs, aggravated drug possession, and possessing criminal tools.[1] The charges were based on chemicals and tools used to manufacture methamphetamine found in Wiley's garage and finished methamphetamine found in his home.

{¶ 2}   Wiley presents four assignments of error. He alleges that the state failed to establish an adequate chain of custody for some of the criminal tools admitted at trial as exhibits. Wiley also alleges that the convictions are not supported by legally sufficient evidence and that the convictions are against the manifest weight of the evidence. Wiley lastly alleges that the trial court should have sua sponte given the jury a limiting instruction regarding certain witness testimony.

{¶ 3}   Finding no merit in any of these allegations, we affirm.

## A. The Evidence

### 1. *The items found on Wiley's property*

{¶ 4}   Detective Christopher Clark, a narcotics detective with the Darke County Sheriff's Office, received information linking Wiley to a methamphetamine manufacturing operation. Clark's investigation revealed that meth was being manufactured in a rural, one-room cabin at the end of Wiley Road in Darke County. This short road branches off Braffetsville-North Road less than a mile north of Wiley's home. While he does not own the property on which the cabin sits, Wiley was the one who built the cabin. Around 5 a.m. on May 20, 2010, Detective Clark, along with the Darke County special response team (SRT), other Darke County officers, including Detective David Hawes, and officers from two adjacent counties, executed a search warrant on the cabin. Roughly 10-15 minutes later, Clark,

---

[1] A fourth charge, having weapons while under a disability, was dismissed before trial.

the SRT, and some others went to Wiley's home to execute another search warrant. Detective Hawes stayed and helped search the cabin. There they found numerous items used to make methamphetamine.

{¶ 5}   In Wiley's house officers found a baggie of methamphetamine in the pocket of a pair of pants lying on a bathroom floor. Wiley admitted to Detective Clark that the pants were his. Near the house sits a large, detached garage. In the garage officers found numerous chemicals. Paint thinner and Coleman fuel were found. Also found were several instant-cold packs and a box of nasal decongestant. Several other items were also found: a   Mountain Dew bottle with plastic tubing coming out of it. and a Mountain Dew cup with copper tubing in it. In a vehicle, copper and plastic tubing like the kind found in the Mountain Dew bottle and cup was found. Coffee filters, an empty box of pseudoephedrine, and a stripped lithium battery were also found. Two digital scales and, nearby, numerous small ziploc bags were found. The last pertinent items found were a round glass mirror, coated with residue, and a razor blade. Found behind Wiley's garage were an altered propane tank and mason jars coated with residue.

2. *Wiley's admissions*

{¶ 6}   Wiley was not home when the officers arrived, but he showed up about an hour later. Detective Clark interviewed Wiley then. At first Wiley claimed not to know what was going on, saying that he did not mess with meth and did not know how to make it. After Clark told Wiley that he had recovered pharmacies' pseudoephedrine-sales logs that contained Wiley's name in numerous places, Wiley admitted that he knew a little about making it. Wiley told Clark that he did not cook the meth himself and that it was not cooked on his property. He

told Clark that others cooked it two or three times a week in the cabin on Wiley Road. Wiley said that he cleaned up the cabin and brought the garbage to his property. He told Clark that the items the officers found in his garage were from the cabin. Wiley admitted that the methamphetamine made in the cabin, when it was finished, was brought to his property.

{¶ 7}   A few days later, Detective Clark interviewed Wiley again at the Sheriff's Office. Clark asked him about his role in the manufacturing process. When Clark asked Wiley if he had ever bought any materials, Wiley admitted that he had bought lithium batteries. As they talked, Wiley admitted that he had seen others perform parts of the manufacturing process. He began to volunteer information about their process. Wiley told Clark that, after making a batch, they tried to reuse some materials because, Wiley said, it would make the meth "stronger." Clark asked him whether they reused coffee filters, and Wiley replied no, they throw them away after one use. Wiley admitted that he bought pseudoephedrine anywhere and everywhere he could.   Wiley also admitted that he used meth.

3. *The expert testimony*

{¶ 8}   At trial, a forensic chemist from the Miami Valley Regional Crime Laboratory, Brooke Ehlers, testified as an expert in clandestine methamphetamine labs. Ehlers first explained what, in general, would constitute a basic meth lab:

> A basic methamphetamine lab would consist of pseudoephedrine or
> ephedrine. Typically we see at the laboratory pseudoephedrine which can be
> purchased over the counter or behind the pharmacy counter now at the local
> drugstore. An organic solvent. Typically what I see at the laboratory most often
> is Coleman fuel. Lithium batteries. The most common thing that I'm seeing

now are one pot cooks which is where all the ingredients are being done in one container.

And the way that they're using or the way they're doing that is using cold packs that would be broken that contain ammonium nitrate instead of the anhydrous ammonia that you might have heard where they were stealing from the tanks where it's the gas form, and that would be contained within one container which would be the first part of the cook. The second part of the cook would be a salting out process that would include an acid product. (Tr. 394-395).

{¶ 9}  Ehlers analyzed some of the items found in Wiley's garage. She found that the residue on the mirror was methamphetamine. In several of the mason jars Ehlers found an acidic liquid that was consistent with the second part of the cooking process. "Propane tanks," Ehlers said, "are used to store anhydrous ammonia that has been taken from larger nurse anhydrous ammonia tanks." (Tr. 403). She said that Coleman fuel "is the most common organic solvent" that she sees. (Tr. 404). Ehlers explained that it is used "to extract the pseudoephedrine from the cold tablets." (Tr. 404). Paint thinner is also an organic solvent, she said, that could be used for the same purpose. About the instant-cold packs, Ehlers said that "these contain typically ammonia nitrate which could be a substitute for the anhydrous ammonia in the cooking process." (Tr. 405). The Mountain Dew bottle with plastic tubing, said Ehlers, is a gas generator used in the second part of the cooking process. And the Mountain Dew cup with copper tubing, she said, "could possibly be either * * * part of a gas generator or possibly where anhydrous ammonia was being made." (Tr. 405).

**B. Chain of Custody**

{¶ 10} In the first assignment of error, Wiley alleges that the trial court erred when it admitted four of the state's exhibits. He contends that the state failed to establish an adequate chain of custody. "'Chain of custody is a part of the authentication and identification mandate set forth in Evid.R. 901.'" *State v. High*, 143 Ohio App. 3d 232, 248, 2001-Ohio-3530, 757 N.E.2d 1176 (7th Dist.), quoting *State v. Brown*, 107 Ohio App.3d 194, 200, 668 N.E.2d 514 (3d Dist., 1995). Evidence Rule 901 provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); *see State v. Richey*, 64 Ohio St.3d 353, 360, 595 N.E.2d 915 (1992). A court's ruling on the adequacy of authentication is reviewed for abuse of discretion. *State v. Bowling*, 8th Dist. Cuyahoga App. No. 93052, 2010-Ohio-3595, ¶ 33.

{¶ 11} "The threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, requiring only foundational evidence for the trier of fact to conclude that the evidence is indeed what the proponent claims it to be." (Citation omitted.) *State v. Dawson*, 2d Dist. Greene App. No. 2009 CA 63, 2010-Ohio-3904, ¶ 13. "Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result" satisfies the standard. Evid.R. 901(B)(9); *State v. Hunter*, 169 Ohio App. 3d 65, 2006-Ohio-5113, 861 N.E.2d 898, ¶ 16 (6th Dist.). "Testimony that a matter is what it is claimed to be" satisfies it too. Evid.R. 901(B)(1); *High* at 248.

{¶ 12} But "'a strict chain of custody is not always required in order for physical evidence to be admissible.'" *Richey* at 360, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 389,

415 N.E.2d 303 (1980). A chain is needed only when an item is by nature fungible and indistinguishable, having no unique characteristics, like a pill. *State v. Gunner*, 6th Dist. Lucas App. No. L-06-1385, 2008-Ohio-1857, ¶ 16. The proponent of such an item must establish a chain of custody "essentially [to] show[] that the offered item of evidence is authentic as having been in the continuous possession of the state, thus eliminating the possibility that the item has been tampered with or altered from its original form." *Bowling* at ¶ 32. This may be done "through direct testimony or by inference." (Citation omitted.) *Gunner* at ¶ 17. "Usually, an identifying witness testifies to a chain of custody in order to demonstrate that no tampering has occurred and that the physical integrity of the evidence is intact." *Id*. at ¶ 16, citing *Richey* at 360.

{¶ 13} "Given the low threshold for admissibility under Evid.R. 901(A), there is no absolute duty * * * to eliminate or negate all possibilities of substitution, alteration, or tampering–[the party] need only establish that it is reasonably certain that substitution, alteration, or tampering did not occur." (Citation omitted.) *Bowling*, 2010-Ohio-3904, at ¶ 33. "Breaks in the chain of custody go to the weight of the evidence, not to its admissibility." (Citations omitted.) *High*, 143 Ohio App.3d, at 248, 757 N.E.2d 1176.

{¶ 14} Wiley contends that the state failed to establish an adequate chain of custody for Exhibit 74, the instant-cold packets; Exhibit 75, the nasal decongestant and a receipt; Exhibit 76, the glass mirror and razor blade; and Exhibit 77, the coffee filters. The items in each of these exhibits were inside a Darke County Sheriff's Office evidence envelope (except the instant-cold packs, which were in a paper bag because they did not fit in an envelope). Detective Clark testified that the exhibit items were some of the items found in Wiley's

garage. He testified that none of the items appeared to have been altered or tampered with. Clark also testified that when a piece of evidence is found a specific collection process takes place. The item is first photographed. Then it is placed in a special evidence envelope marked "Darke County Sheriff's Office," and the envelope is sealed. Several pieces of information are then written on the envelope: an item number, where it was found, the date and time it was collected, the collector's name and department, and a description of the item. The item number and description are then written on a form that lists all the evidence collected. Finally, the envelope is taken to the Darke County Sheriff's Office and checked into the evidence room. Two people control the evidence room, and evidence must be signed out. Clark said that some of the items collected from Wiley's garage went straight to the evidence room and some went to the crime lab for testing. Once the lab returned them, the items were checked into the evidence room. Ehlers testified that each item the crime lab analyzes receives a bar code, which the lab uses to track the items while they are in its possession. Clark testified that he signed out the items in the four exhibits the day before, and he said that they had been in his custody and control ever since.

{¶ 15} Wiley points out that Clark was not the one who actually found these items, and the detective who did find them did not testify. Wiley contends that because Clark did not actually retrieve the items his testimony cannot establish their chain of custody. We disagree. The trial court heard the testimony of Clark and Ehlers that could be sufficient to   establish with reasonable certainty that substitution, alteration, or tampering of the exhibit items did not occur. Therefore it was reasonable of the court to conclude that the state satisfied the authentication standard and the trial court did not abuse its discretion by admitting the

exhibits. Finally, the court instructed the jury that it may consider "whether the exhibits are the same objects and if they're in the same condition as originally taken." (T 465)

**{¶ 16}** The first assignment of error is overruled.

## C. The Sufficiency and Weight of the Evidence

**{¶ 17}** In the second and third assignments of error, Wiley alleges respectively that the evidence is insufficient to support any of the convictions and that the convictions are contrary to the manifest weight of the evidence.

1. *The sufficiency of the evidence*

**{¶ 18}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Citation omitted.) *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). Circumstantial and direct evidence possess "the same probative value." *Id.* At 272. And "permissible inferences of knowledge, based at least in part upon fact, could prove an essential element of the offense." *State v. Jordan*, 89 Ohio St.3d 488, 495, 733 N.E.2d 601 (2000). "The inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶ 19}** Each of the three offenses here requires proof that the accused possessed something, just as their names suggest. Illegal assembly or possession of chemicals for the manufacture of drugs requires proof that the accused "possess[ed] one or more chemicals that

may be used to manufacture a controlled substance." R.C. 2925.041(A). Aggravated possession of drugs requires proof that he "possess[ed] * * * a controlled substance." R.C. 2925.11(A). And possessing criminal tools requires proof that the accused "possess[ed] * * * any substance, device, instrument, or article" (with the intent to use the item criminally). R.C. 2923.24(A). Wiley contends that the evidence is insufficient to prove these possession elements.

{¶ 20} Possession, "having control over a thing or substance," R.C. 2925.01(K), may be actual or constructive. *State v. Cooper*, 2d Dist. Montgomery App. No. 24321, 2011-Ohio-5017, ¶ 61, citing *State v. Butler*, 42 Ohio St.3d 174, 538 N.E.2d 98 (1989). The present case concerns only constructive possession. A person constructively possess an item "when he is conscious of the presence of the object and able to exercise dominion and control over that item." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982). One's "mere proximity is in itself insufficient to establish constructive possession." *State v. Kingsland*, 177 Ohio App.3d 655, 2008-Ohio-4148, 895 N.E.2d 633, ¶ 13. But "proximity to an object may constitute some evidence of constructive possession." *Id*. Also, possession "may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

{¶ 21} Wiley points out that no direct evidence specifically links him to the chemicals or items found in his garage. While he is correct, such evidence is unnecessary. The fact of possession may be inferred. And the evidence in this case permitted the jury to infer that Wiley (constructively) possessed the chemicals and items. Contrary to Wiley's contention, this inference is supported by more than his "mere access" to the items through ownership of the

garage. It is also supported by more than his "mere proximity" to the items. Both the chemicals and tools used to manufacture methamphetamine and finished methamphetamine were found on Wiley's property. The chemicals were found in his garage. Wiley admitted that the tools were brought from the cabin where they were used to manufacture meth. Wiley admitted that he had bought pseudoephedrine and lithium batteries. This circumstantial evidence is sufficient to find that Wiley possessed the chemicals and tools–that he knew the chemicals and tools were in his garage and that he exercised dominion and control over them. A baggie of finished meth was found in a pair of pants that Wiley admitted were his. He admitted that the meth made in the cabin was brought to his property. And, Wiley admitted that he had used meth. This circumstantial evidence is sufficient to find that Wiley possessed a controlled substance. Therefore a reasonable trier of fact could have found the possession element of each offense proven beyond a reasonable doubt.

{¶ 22} The second assignment of error is overruled.

2. *The manifest weight of the evidence*

{¶ 23} Wiley's manifest-weight argument primarily relies on the sufficiency-of-the-evidence argument. To that argument he adds a specific contention regarding the conviction for illegal assembly or possession of chemicals for the manufacture of drugs. Wiley argues that the evidence weighs against finding that he had the intent to manufacture methamphetamine because witnesses testified expressly that they had not seen him making it and no evidence contradicts their testimony.

{¶ 24} Under the manifest-weight standard, an appellate court acts like a "'thirteenth juror'" and examines the factfinders' resolution of the conflicting testimony. *State v.*

*Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). This is the test: "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Hunter*, — Ohio St.3d —, 2011-Ohio-6524, ¶ 119, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). Regarding the possession element, based on our review of the evidence presented, the most pertinent parts of which we discussed above, we cannot say that the jury clearly lost its way in finding that the state proved the possession element for each offense. Nor can we say that the jury clearly lost its way in finding that the state had proved Wiley's intent to manufacture methamphetamine.

{¶ 25} To be convicted of  illegal assembly or possession of chemicals for the manufacture of drugs, the state must prove that the accused possessed a chemical "with the intent to manufacture a controlled substance * * * in violation of section 2925.04_of the Revised Code." R.C. 2925.041(A). "Intent lies within the privacy of an individual's own thoughts and is not susceptible of objective proof." *State v. England*, 6th Dist. Williams App. No. WM-10-012, 2011-Ohio-1144, ¶ 24, citing *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995). So "intent 'can never be proved by the direct testimony of a third person.'" *State v. Moon*, 4th Dist. Adams App. No. 08CA875, 2009-Ohio-4830, ¶ 20, quoting *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990). Rather it "'must * * * be inferred from the act itself and the surrounding circumstances, including the acts and statements of the

defendant surrounding the time of the offense.'"*Id*., quoting *State v. Wilson*, 12th Dist. Warren App. No. CA2006-01-007, 2007-Ohio-Ohio-2298, ¶ 41. But "persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *Garner* at 60.

{¶ 26} Wiley's intent may reasonably be inferred from the evidence. What the Fourth District said about a defendant in a similar case is also true of Wiley: "Even if appellant's participation was, as she suggests, minimal, appellant nonetheless played a role in the manufacturing of methamphetamine." *Moon* at ¶ 24. Wiley's statements show that he played a role, albeit by his admission, perhaps a small role, in the manufacturing process–he bought pseudoephedrine and batteries; he knew how meth was made; he cleaned up the place where the meth was being made. Wiley's admissions allow the conclusion that he intended methamphetamine to be manufactured. Like Wiley, the defendant in the Fourth District's case asserted that no direct evidence linked her to the manufacture of methamphetamine. We agree with the court's response:

> All of these circumstances combined help to show that appellant knowingly assembled or possessed one or more chemicals for the manufacture of methamphetamine with the intent to manufacture methamphetamine. Her assertion that the prosecution lacks direct, physical evidence to tie her to the crime may be correct as certainly worthy of argument before the trier of fact, but nothing prohibits the prosecution from proving the elements of the crime with circumstantial evidence. *Id*.

{¶ 27} The third assignment of error is overruled.

**D. The Jury Instruction**

{¶ 28} In the fourth assignment of error, Wiley alleges that the trial court erred by failing to give the jury a limiting instruction on the conduct of others as probative evidence against Wiley himself. During the testimony of two witnesses, the jury heard about people associated with Wiley cooking methamphetamine in the Wiley Road cabin. The judge told the parties that he was considering whether to give an instruction "about whether other people's conduct is probative or not," noting that "the inferences and allegations of other's conduct may or may not be relevant." (Tr. 228). The judge invited the parties' thoughts on the matter, saying, "It's something I have to think about because it's out there. So you might want to help me think my way through it as we get there." (Tr. 228-229). Ultimately, Wiley never requested such an instruction and the court did not give one on its own.

{¶ 29} Wiley concedes that, by not requesting the instruction, he waived all but plain error. *See State v. Crowley*, 2d Dist. Clark App. No. 2009 CA 65, 2009-Ohio-6689. This Court has recognized that while "a defendant is entitled to an appropriate instruction limiting the scope of a jury's consideration of potentially prejudicial evidence that is admitted for a limited purpose * * *, a defendant may rationally choose not to avail himself of his right to a limiting instruction because of his concern that it will only remind the jury of the evidence to which the instruction applies, and thereby reinforce the prejudice." *State v. McDaniel*, 2d Dist. Clark App. No. 2853, 1992 WL 206759, *3 (Aug. 19, 1992). "Because there may be good reasons for a defendant to elect to waive his right to a limiting instruction," we said, "a reviewing court should be reluctant to find plain error where a defendant has not requested a limiting instruction." *Id*. In the present case, Wiley may have decided not to seek the limiting

instruction so as not to remind the jury of his association with those who were undisputedly manufacturing methamphetamine in the cabin. We therefore decline to find that the trial court's decision not to give the instruction sua sponte was plainly erroneous.

**{¶ 30}** The fourth assignment of error is overruled.

**{¶ 31}** We have overruled each assignment of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FROELICH and FAIN, JJ., concur.


Copies mailed to:

R. Kelly Ormsby, III
Deborah S. Quigley
Nicole L. Harrison
Hon. Jonathan P. Hein