[Cite as *State v. Ramos*, 2019-Ohio-3588.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28214 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1266 |
| | : | |
| RICHARD RAMOS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of September, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

SEAN BRINKMAN, Atty. Reg. No. 0088253, 10 West Monument Avenue, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Richard Ramos, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of aggravated possession of drugs. In support of his appeal, Ramos contends that the trial court erred by admitting certain drug evidence at trial on grounds that the State failed to establish a continuous chain of custody necessary to identify the drug evidence as the same substance that was recovered from his vehicle. Ramos also contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On April 17, 2018, Ramos was indicted for one count of aggravated possession of drugs in violation of R.C. 2925.11(A), a felony of the fifth degree. The charge arose after officers from the Kettering Police Department discovered 0.18 grams of methamphetamine in Ramos's vehicle during a traffic stop. Ramos pled not guilty to the charge and the matter proceeded to a jury trial. At trial, the State presented several witnesses, including Kettering Detective Amy Pedro, Kettering Police Officers Brian Robinson, Jesse Anderson, Eric Hall, and Devin Maloney, and forensic chemist Beth Underwood. The following is a summary of their trial testimony.

{¶ 3} Detective Pedro testified that she was a narcotics unit detective with the City of Kettering Police Department. Pedro testified that during her 11 years as a Kettering officer, she had been involved in hundreds of traffic stops that involved the recovery of drugs. During the early morning hours of October 20, 2017, she was conducting

undercover surveillance when she happened to observe a vehicle make an improper, wide turn from Willamet Road onto northbound Wilmington Pike. Pedro testified that, as the vehicle continued on Wilmington Pike, she observed the vehicle swerve across traffic lanes twice. Based on these observations, Pedro believed the driver of the vehicle was impaired and requested a traffic stop. Pedro testified that she did not conduct the traffic stop herself because she was driving an unmarked vehicle and was wearing plainclothes.

{¶ 4} Kettering Police Officer Brian Robinson testified that he received Detective Pedro's request for a traffic stop from dispatch and attempted to locate the vehicle in question. Shortly after receiving this request, Robinson observed a vehicle matching the description given by Pedro at the intersection of Patterson Road and Smithville Road in the city of Dayton. Robinson testified that Kettering officers have concurrent jurisdiction in Dayton.

{¶ 5} After Officer Robinson confirmed that the vehicle had the same license plate and was the same model and color as the vehicle observed by Detective Pedro, Robinson observed the vehicle turn right from Smithville Road onto Patterson Road. Robinson testified that as the vehicle was making that turn, he observed both of the vehicle's driver-side tires cross the double yellow line into the opposite lane of traffic. Following this lane violation, Robinson initiated a traffic stop of the vehicle near Patterson Road and Grace Avenue.

{¶ 6} Officer Robinson testified that Officers Jesse Anderson and Eric Hall arrived at the scene shortly after he initiated the traffic stop. Robinson testified that he approached the passenger side of the vehicle while Anderson simultaneously approached the driver side. At that time, Robinson observed a male in the driver seat,

later identified as Ramos, and a female in the front passenger seat, later identified as Megan Denny.   Robinson testified that, as he explained the reason for the traffic stop, he noticed that Ramos appeared to be nervous.   Robinson specifically recalled Ramos stuttering and talking very fast.   Robinson testified that Ramos's nervousness was inconsistent with the nervousness that motorists normally exhibit when being pulled over. This, according to Robinson, led him to believe that there was possibly more going on than just a minor traffic violation.   Robinson claimed that the passenger, Denny, did not appear to be nervous.

{¶ 7} Continuing, Officer Robinson testified that Ramos was initially uncooperative when he asked for him to turn off his vehicle and handover his keys.   Robinson also testified that Ramos was initially uncooperative when he asked him to exit the vehicle. However, Robinson testified that Ramos eventually complied with his commands.   As Ramos exited the vehicle, Robinson testified that he moved to the driver's side of the vehicle with Officer Anderson, and that Officer Hall took his position at the passenger side and watched Denny.

{¶ 8} Officer Anderson testified that, after Ramos exited the vehicle, he conducted a consensual pat-down search of Ramos's person.   Anderson also testified that Ramos appeared to be either nervous or on a stimulant because Ramos's hands were shaking during the pat down.   Anderson testified that he asked Ramos why he was shaking and that Ramos indicated it was due to a back injury.

{¶ 9} While Officers Anderson and Robinson made contact with Ramos outside the vehicle, the passenger, Denny, remained seated in the vehicle's passenger seat. During this time, Officer Hall testified that he maintained sight of Denny.   While

maintaining sight of Denny, Hall testified that he stood one foot away from where Denny was sitting and watched her hands. Officer Hall testified that he did not observe Denny make any unusual gestures or movements. Rather, Hall claimed that Denny's behavior was normal and calm throughout the traffic stop.

{¶ 10} As Officer Anderson watched Ramos, and as Officer Hall watched Denny, Officer Robinson went to his cruiser to run Ramos's and Denny's information. During that time, Robinson requested the assistance of a K-9 unit. Robinson testified that the K-9 unit, Officer Devin Maloney and his German Shepard Jax, arrived at the scene shortly after the request. Robinson and Maloney testified that Maloney walked Jax around the exterior of the vehicle to conduct a free air sniff. Both officers testified that Jax alerted on the vehicle, indicating the presence of narcotics at the front driver-side door.

{¶ 11} Following Jax's alert, Officer Maloney testified that he opened the front driver-side door and searched the vehicle. Upon opening the door, Maloney testified that he observed a chunk of suspected methamphetamine sitting on the driver seat. Officer Robinson testified that he also observed the suspected methamphetamine on the driver seat where Ramos had been sitting. Robinson described the suspected methamphetamine as a "crystal cloudy substance." Trial Trans. (Oct. 9, 2018), p. 36. Robinson testified that he also discovered small pieces of suspected methamphetamine on the driver-side floorboard. However, no drugs were discovered in the passenger side of the vehicle.

{¶ 12} After the suspected drugs were discovered in the vehicle, the officers arrested Ramos and released Denny. Ramos was then booked into jail where he made a jailhouse phone call to his mother. The State presented portions of that recorded call,

during which Ramos indicated that the vehicle was titled in his name. Detective Pedro testified that she confirmed through the LEADS system that Ramos was the registered owner of the vehicle. During the jailhouse call, Ramos also told his mother that three "fingernails" of methamphetamine were found inside his vehicle. State's Exhibit 4(A). At no point during the call did Ramos claim the methamphetamine belonged to Denny. Rather, Ramos told his mother that the officers had planted the methamphetamine there. To show that such conduct by the four officers was unlikely, the State presented testimony from Detective Pedro indicating that any such conduct would put the officers' careers, retirements, and pensions at stake and result in criminal charges.

{¶ 13} Officer Robinson testified that he collected the suspected methamphetamine from Ramos's vehicle and booked it into the Kettering Police Department's property room. To do this, Robinson testified that he put the methamphetamine into a plastic container, placed the container inside a sealed envelope on which he wrote the date and his initials, and attached a property tag. At trial, Robinson identified State's Exhibit 3 as the sealed envelope and plastic container in which he placed the suspected methamphetamine. Robinson testified that he recognized the envelope due to it bearing his written initials and the date. Robinson also testified that the substance inside the plastic container appeared to be the same rocky substance that he collected from Ramos's vehicle. Robinson further recognized State's Exhibit 3 because the plastic container contained a handful of plastic baggies that he claimed to have placed inside the container at the time he booked the evidence into the property room.

{¶ 14} Robinson testified that he secured the envelope and container containing

the suspected methamphetamine in a locked evidence locker inside the Kettering Police Department's property room. Detective Pedro testified that the Kettering Police Department maintains a log of when evidence is checked in and out of the property room and that she reviewed the log prior to trial. Pedro testified that the log confirmed that Officer Robinson initially submitted the drug evidence to the property room at 4:23 a.m. on October 20, 2017. Pedro also testified that the log indicated that Detective Mason checked the drug evidence out of the property room at 10:00 a.m. on the same day and released it to Officer Shelly Davis for transport to the Ohio Bureau of Criminal Investigation ("BCI") for testing. Pedro testified that the evidence was not checked back into Kettering's property room until March 5, 2018. Pedro further testified that on August 7, 2018, Detective Mason transported the drug evidence back to BCI for retesting and that the evidence was thereafter returned to Kettering's property room on August 16, 2018.

{¶ 15} BCI forensic chemist Beth Underwood testified that when a law enforcement agency submits evidence to BCI, the evidence is initially given to one of three evidence-receiving staff members. According to Underwood, those staff members then adhere a unique barcode and case number to the evidence. Underwood testified that after the evidence is given a barcode and case number, it is scanned to a specific location in a secure drug vault where the evidence remains until an analyst is ready to conduct the necessary testing. Underwood testified that when the evidence is checked out of the drug vault for testing, it is scanned into the analyst's custody to ensure the chain of custody is properly recorded in BCI's Laboratory Information Management System.

{¶ 16} Due to a backlog at BCI, Underwood testified that the drug evidence in this

case was outsourced to a private, accredited lab known as NMS Labs ("NMS"). This transfer occurred in January 2018. With regard to accreditation, Underwood testified that NMS is also an accredited lab and that to maintain accreditation, certain standards and protocols must be maintained, including protocols involving the chain of custody. Underwood testified that based on NMS's accreditation, she assumed that the drug evidence was kept in a secure location at NMS.

{¶ 17} Underwood testified that she did not know the NMS analyst who tested the drug evidence in this case, but that the analyst wrote his or her initials "MAJ" and the date "1/16/18" on all the packaging, thus indicating the analyst had opened the evidence and tested the substance therein. Underwood testified that after NMS completed its testing, the evidence was sent back to BCI in February 2018, and returned to BCI's secure drug vault. From there, Underwood testified that the evidence was returned to the Kettering Police Department.

{¶ 18} In addition, Underwood testified that, because BCI and NMS have an agreement that NMS analysts are not required to testify in court, the drug evidence in this case was resubmitted to BCI for retesting in August 2018, so that BCI could do its own testing and send its own analyst to testify in court. Underwood testified that she was the BCI analyst who tested the drug evidence at issue and that she began her testing on August 7, 2018. When presented with State's Exhibit 3 at trial, Underwood recognized it as the package of drug evidence she tested, noting that the envelope bore a BCI barcode sticker, item number, her written initials, the date she took the evidence into her custody, and the date she sealed the evidence.

{¶ 19} Underwood testified that the substance she tested weighed 0.18 grams and

that her test results indicated to a reasonable degree of scientific certainty that the substance contained methamphetamine. After her test results were peer-reviewed by another BCI analyst, Underwood testified that she ensured the evidence was properly sealed, scanned, and returned to BCI's secure drug vault. According to Underwood, this was done so that the receiving staff would know that the evidence was ready to be returned to the Kettering Police Department.

{¶ 20} Following the presentation of the aforementioned testimony and evidence, the State rested its case. Ramos did not present any testimony or witnesses. Ramos, however, did make a Crim.R. 29 motion for acquittal, which the trial court overruled. Thereafter, the jury deliberated and found Ramos guilty of aggravated possession of drugs as charged in the indictment. At sentencing, the trial court imposed a ten-month prison term for the offense. Ramos now appeals from his conviction, raising two assignments of error for review.

## First Assignment of Error

{¶ 21} Under his first assignment of error, Ramos contends that the trial court erred in admitting the drug evidence (State's Exhibit 3) at trial because the State failed to establish a continuous chain of custody necessary to identify the evidence as the same substance that was recovered from his vehicle on October 20, 2017. Specifically, Ramos claims that there was break in the chain of custody because no one from the outsourced lab, NMS, identified the drug evidence or testified regarding NMS's chain of custody or its lab procedures. Ramos's argument lacks merit.

{¶ 22} " 'A chain of custody is part of the authentication and identification mandate

set forth in [Evid.R. 901][.]' " *State v. Ayers*, 2d Dist. Montgomery No. 25563, 2013-Ohio-5337, ¶ 10, quoting *State v. Rodriguez*, 6th Dist. Wood No. WD-05-026, 2006-Ohio-2121, ¶ 16. Pursuant to Evid.R. 901(A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A trial court's ruling on the adequacy of authentication is reviewed for abuse of discretion. *State v. Wiley*, 2d Dist. Darke No. 2011-CA-8, 2012-Ohio-512, ¶ 10, citing *State v. Bowling*, 8th Dist. Cuyahoga No. 93052, 2010-Ohio-3595, ¶ 33.

**{¶ 23}** "A chain [of custody] is needed only when an item is by nature fungible and indistinguishable, having no unique characteristics, like a pill." *Id.* at ¶ 12, citing *State v. Gunner*, 6th Dist. Lucas No. L-06-1385, 2008-Ohio-1857, ¶ 16. "The proponent of such an item must establish a chain of custody 'essentially [to] show[ ] that the offered item of evidence is authentic as having been in the continuous possession of the state, thus eliminating the possibility that the item has been tampered with or altered from its original form.' " *Id.*, quoting *Bowling* at ¶ 32.

**{¶ 24}** "As a general matter, 'the state [is] not required to prove a perfect, unbroken chain of custody.' " *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 57, quoting *State v. Keene*, 81 Ohio St.3d 646, 662, 693 N.E.2d 246 (1998). *Accord State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603, ¶ 52. A strict chain of custody is therefore " 'not always required in order for physical evidence to be admissible.' " *Gross* at ¶ 57, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 389, 415 N.E.2d 303 (1980). " 'Given the low threshold for admissibility under Evid.R. 901(A), there is no absolute duty * * * to eliminate or negate all possibilities of substitution,

alteration, or tampering—[the party] need only establish that it is reasonably certain that substitution, alteration, or tampering did not occur.' " *Wiley* at ¶ 13, quoting *Bowling* at ¶ 33. This may be accomplished " 'through direct testimony or by inference.' " *Id.* at ¶ 12, quoting *Gunner* at ¶ 17.

{¶ 25} Moreover, " '[b]reaks in the chain of custody go to the weight of the evidence, not to its admissibility.' " *Wiley*, 2d Dist. Darke No. 2011-CA-8, 2012-Ohio-512 at ¶ 13, quoting *State v. High*, 143 Ohio App.3d 232, 248, 757 N.E.2d 1176 (7th Dist.2001). Therefore, "even if the chain of custody is broken, that fact alone will not render the evidence inadmissible." *State v. Lenoir*, 5th Dist. Delaware No. 10CAA010011, 2010-Ohio-4910, ¶ 19, citing *State v. Walton*, 8th Dist. Cuyahoga No. 88358, 2009-Ohio-1234, ¶ 6.

{¶ 26} For example, in *State v. Brock*, 2d Dist. Montgomery No. 19291, 2002-Ohio-7292, this court upheld the admission of evidence despite there being a break in the chain of custody. The evidence at issue in *Brock* was a Mountain Dew can that Brock had used as a makeshift crack pipe while he was staying at a Volunteers of America facility. *Id.* at ¶ 2-4. After the house manager of the facility observed Brock using the can to smoke crack cocaine, he removed the can from Brock's possession and called the police. *Id.* at ¶ 4. The house manager thereafter put the can in a control booth where another staff member could watch over it until the police arrived. *Id.* at ¶ 44. When the police arrived, the officers conducted a field test on the can which revealed the presence of crack cocaine. *Id.* at ¶ 4.

{¶ 27} On appeal, Brock argued that the can should not have been admitted into evidence because the staff member who watched the can did not testify a trial. *Id.* at

¶ 43, 47.   Brock claimed that this resulted in a break in the chain of custody during which someone could have altered the can by putting cocaine residue on it.   *Id.* at ¶ 47.   In response to Brock's claim, this court held that a strict chain of custody was not required for the can to be admissible and that the possibility of contamination went to the weight of the evidence not its admissibility.   *Id.* at ¶ 48.   We also held that the State presented sufficient evidence to support a finding that the can admitted into evidence was the same can taken from Brock by the house manager.   This was because the house manager identified the can at trial and testified that the can fit the description and features of the can that was taken from Brock at the crime scene.   *Id.* at ¶ 44, 48.

{¶ 28} This court also upheld the admission of evidence despite there being a break in the chain of custody in *State v. Sheeders*, 2d Dist. Darke No. 2019-CA-2, 2019-Ohio-3120.   The evidence at issue in *Sheeders* was a knife used by Sheeders while committing aggravated menacing and unlawful restraint.   *Id.* at ¶ 2-11, 20.   On appeal from his conviction, Sheeders argued that the knife should not have been admitted into evidence because the police officer who took possession of the knife at the crime scene did not testify, thus causing a break in the chain of custody.   *Id.* at ¶ 15.

{¶ 29} In response to Sheeder's argument, this court once again noted that a strict chain of custody is not always required for physical evidence to be admissible and that arguments relating to the chain of custody go to the weight of the evidence not its admissibility.   *Id.* at ¶ 18.   Since there were two trial witnesses who identified the knife as the one used by Sheeders when he committed the offenses in question, we held that the trial court did not abuse its discretion in admitting the knife into evidence without the chain of custody testimony from the officer who transported the knife to the police

department. *Id.* at ¶ 22. *See State v. Pircio*, 8th Dist. Cuyahoga No. 54983, 1989 WL 7962, *4 (Feb. 2, 1989) (holding "[t]he failure of the prosecution to have every party who handled the evidence testify does not cause the custodial chain to fall").

**{¶ 30}** In *State v. Conley*, 32 Ohio App.2d 54, 288 N.E.2d 296 (3d Dist.1971), the Third District Court of Appeals was faced with a break in the chain of custody for 18 orange pills that were found on Conley and submitted to BCI for testing. On appeal, Conley argued that the pills should not have been admitted into evidence because there was no direct testimony from the employee at BCI who received the pills from law enforcement and placed the pills in the drawer where the BCI chemist retrieved them for testing. *Id.* at 60-62. However, the Third District held that "direct testimony as to custody is not the only way that identity [of evidence] may be established." *Id.* at 62. Rather, the court held that identity "may also be established by inference." *Id.*

**{¶ 31}** In upholding the admissibility of the pills into evidence, the Third District found that several inferences strongly indicated that the pills presented at trial were the same pills taken from Conley. *Id.* Specifically, the court found that: (1) the property envelope containing the pills was positively identified by the collecting officer's writings on it; (2) the contents of the envelope were identical in description in that the amount, size, shape, and color of the pills were identical to the ones collected from Conley; and (3) all witnesses testified that the pills and accompanying wrapping were similar to those received from Conley. *Id.* The court also noted that the BCI chemist who analyzed the pills testified to BCI's standard operating procedure for handling the evidence, which enabled the court to infer that the pills that arrived at BCI were the same pills tested. *Id.* Therefore, because there were several inferences that strongly indicated that the pills

presented at trial were the same pills taken from Conley, the court held that a jury could have identified the pills beyond a reasonable doubt. *Id*.

{¶ 32} The present case is analogous to *Brock*, *Sheeders*, and *Conley*. In this case, there was a break in the chain of custody because BCI outsourced the drug evidence at issue to NMS for initial testing and no one from NMS testified regarding its handling of the evidence or its lab procedures. However, as previously discussed, a perfect chain of custody is not necessary and a break in the chain of custody goes to the weight of the evidence not its admissibility. In this case, despite the break in the chain of custody, we find that the trial court did not abuse its discretion in admitting the drug evidence (State's Exhibit 3) at trial.

{¶ 33} Although Officer Robinson and Officer Maloney admitted on cross-examination that the small chunks of methamphetamine marked as State's Exhibit 3 were not readily distinguishable from other similar small chunks of methamphetamine, they nevertheless testified that the substance appeared to be the same substance observed and collected from Ramos's vehicle on the night of the traffic stop. Maloney specifically testified that the methamphetamine marked as State's Exhibit 3 looked similar because it was the same size and type of substance.

{¶ 34} More importantly, however, the record indicates that there was a distinctiveness to the packaging in which the methamphetamine was stored that allowed Officer Robinson to identify the methamphetamine at trial. Specifically, Robinson testified that he believed State's Exhibit 3 contained the same methamphetamine that he collected from Ramos's vehicle because it was stored in the same plastic container with the same plastic baggies that he had placed inside the container. Robinson also

recognized his written initials and date placed on the outside of the envelope in which the plastic container was sealed. The forensic chemist, Underwood, further testified to receiving the same envelope and plastic container at BCI and to testing the substance within. Therefore, by virtue of the packaging, it may be reasonably inferred that Underwood tested the same substance that Robinson collected and packaged on the day of the offense.

{¶ 35} As a further matter, because Underwood testified that NMS is an accredited lab, it may also be reasonably inferred that NMS followed chain of custody and evidence storage protocols that are similar to those followed by BCI. Underwood's testimony indicates that BCI keeps very precise chain of custody records using a barcode and scanning system and that BCI securely stores evidence in a locked drug vault. It would be reasonable to infer that a fellow accredited lab such as NMS took similar care to ensure that the drug evidence at issue was properly tracked and secured while it was being tested. Therefore, even though there is a gap in the chain of custody during the time the evidence was at NMS, based on the aforementioned testimony and evidence, it was reasonable for the trial court to conclude that State's Exhibit 3 was what the State purported it to be—that is, the substance collected from Ramos's vehicle on October 20, 2017. Accordingly, the trial court did not abuse its discretion in admitting State's Exhibit 3 at trial.

{¶ 36} Ramos's first assignment of error is overruled.


## Second Assignment of Error

{¶ 37} Under his second assignment of error, Ramos contends that his conviction

for aggravated possession of drugs was against the manifest weight of the evidence. In support of this claim, Ramos alleges that the State failed to prove that he knowingly possessed the methamphetamine at issue. Although Ramos's argument is couched as a manifest weight claim, Ramos is actually challenging the sufficiency of the evidence. Regardless of that fact, a review of the record indicates that Ramos's conviction was both supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 38} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 39} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier

of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387 quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 40} In this case, Ramos was convicted for one count of aggravated possession of drugs in violation of R.C. 2925.11(A). For the jury to find Ramos guilty of this offense, the State was required to prove that he knowingly possessed a controlled substance. R.C. 2925.11(A). As noted above, Ramos claims that the State failed to prove the "knowingly possessed" element of the offense. In support of this claim, Ramos asserts that the State failed to present any evidence establishing that he knew the methamphetamine was inside his vehicle. Ramos also contends that the evidence regarding his proximity to the methamphetamine and his ownership of the vehicle was insufficient to establish that he possessed the drugs. We disagree.

{¶ 41} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.* "[T]he element of knowledge is to be determined from the attendant facts and circumstances particular to each case." *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049 (1998). "Thus, whether a person charged with drug abuse in violation of R.C. 2925.11 knowingly possessed * * * a controlled substance is to be determined from all the attendant facts

and circumstances available." *Id.*

{¶ 42} As for the possession element, "[f]or purposes of R.C. 2925.11(A), a person may 'possess' a controlled substance either physically or constructively." *State v. Zaragoza*, 2d Dist. Montgomery No. 27290, 2017-Ohio-7944, ¶ 32, citing *State v. Charlton*, 2d Dist. Montgomery No. 23227, 2010-Ohio-1683, ¶ 22, citing *State v. Butler*, 42 Ohio St.3d 174, 175, 538 N.E.2d 98 (1989). "A person has constructive possession of something if he is aware of its presence and is able to exercise dominion and control over it, 'even though [it] may not be within his immediate physical possession.' " *Id.*, quoting *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. (Other citations omitted.)

{¶ 43} Although possession "may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found[,]" the discovery of "readily usable drugs in close proximity to an accused may constitute sufficient circumstantial evidence to support a finding of constructive possession." R.C. 2925.01(K); *State v. Townsend*, 2d Dist. Montgomery No. 18670, 2001 WL 959186, *3 (Aug. 24, 2001). *Accord Charlton* at ¶ 23, citing *State v. Miller*, 2d Dist. Montgomery No. 19174, 2002-Ohio-4197, ¶ 14. *See also State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 41 ("when one is the driver of a car in which drugs are within easy access of the driver, constructive possession may be established"); *State v. Ruby*, 149 Ohio App.3d 541, 2002-Ohio-5381, 778 N.E.2d 101, ¶ 42-43 (2d Dist.) (holding a reasonable trier of fact could conclude beyond a reasonable doubt that the defendant, who was driving his wife's vehicle with a passenger, constructively possessed drug paraphernalia and crack cocaine that was recovered from

the vehicle's floor behind the driver's seat where the defendant was seated).

**{¶ 44}** "The State may prove constructive possession solely through circumstantial evidence" as "[c]ircumstantial evidence and direct evidence have the same probative value." *Charlton* at ¶ 23, citing *State v. Barnett*, 2d Dist. Montgomery No. 19185, 2002-Ohio-4961, ¶ 11, and *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. * * *' " *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979).

**{¶ 45}** In this case, we find that the State presented sufficient circumstantial evidence at trial for a reasonable trier of fact to find that Ramos knowingly possessed the methamphetamine at issue. As for the knowing element, Officer Robinson testified that after he stopped Ramos's vehicle and explained to Ramos the reasons for the stop, Ramos stuttered, spoke very fast, and appeared nervous. Officer Anderson also testified that Ramos appeared to be either nervous or on a stimulant, as Anderson observed Ramos's hands shaking while he was patting him down. Officer Robinson further testified that Ramos's nervousness was inconsistent with normal nervousness that motorists exhibit when being pulled over, and that Ramos's nervous behavior made him believe that there was possibly more going on than just the traffic violation. Officers Robinson and Anderson additionally testified that Ramos was initially uncooperative when Ramos was asked to turn off and exit his vehicle.

**{¶ 46}** The officers' testimony regarding Ramos's conduct during the traffic stop is

circumstantial evidence of consciousness of guilt and awareness of the circumstances. In other words, a reasonable trier of fact could have found that Ramos's nervous behavior and uncooperativeness was due to Ramos knowing that there were illegal drugs in the vehicle. Therefore, Ramos's claim that the State failed to present any evidence indicating that he knew the drugs were in the vehicle lacks merit.

{¶ 47} With regard to the possession element, Officer Robinson and Officer Maloney both testified that they observed a small piece of suspected methamphetamine on the driver seat of Ramos's vehicle after Jax alerted at the front driver-side door. Officer Robinson also testified to observing small pieces of suspected methamphetamine on the driver-side floorboard. There is no dispute that Ramos was the registered owner of the vehicle and that Ramos was driving at the time of the traffic stop. Therefore, Ramos had been sitting on the driver's seat and was directly above the driver-side floorboard just prior to when the officer's discovered the methamphetamine in those areas.

{¶ 48} Detective Pedro also testified that users of methamphetamine in the crystalline form discovered in Ramos's vehicle typically ingest the drug by snorting it, smoking it, using it intravenously, or sometimes even eating it. The methamphetamine found in Ramos's vehicle was therefore in a readily usable form. We find that Ramos's ownership of the vehicle and his close proximity to where the readily usable methamphetamine was found was sufficient circumstantial evidence of constructive possession. Ramos's claim otherwise lacks merit.

{¶ 49} Although Ramos argues that the drugs could have belonged to the front-seat passenger, Denny, it was the province of the jury to weigh the evidence and

determine whether that was the case. Given that: (1) Ramos never indicated that the drugs were Denny's on the recorded jailhouse call to his mother; (2) Officer Hall testified that he watched Denny in the vehicle from a foot away and did not observe her make any unusual movements or gestures, but observed her to be acting normal and calm; and (3) no drugs were found in the passenger compartment of the vehicle where Denny was located, we cannot say that the jury lost its way and created a manifest miscarriage of justice in finding that Ramos as opposed to Denny knowingly possessed the methamphetamine. Therefore, we find that Ramos's conviction was not only supported by sufficient evidence, but it was also not against the manifest weight of the evidence.

{¶ 50} Ramos's second assignment of error is overruled.

## Conclusion

{¶ 51} Having overruled both assignments of error raised by Ramos, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Sean Brinkman
Hon. Mary Lynn Wiseman