[Cite as *State v. Lawson*, 2020-Ohio-6852.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

|                              |     |                                        |
| ---------------------------- | --- | -------------------------------------- |
| STATE OF OHIO                | :   |                                        |
|                              | :   | Appellate Case No. 2020-CA-16          |
| Plaintiff-Appellee           | :   |                                        |
|                              | :   | Trial Court Case No. 2019-CR-555       |
| v.                           | :   |                                        |
|                              | :   | (Criminal Appeal from                  |
| THOMAS W. LAWSON             | :   | Common Pleas Court)                    |
|                              | :   |                                        |
| Defendant-Appellant          | :   |                                        |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of December, 2020.

. . . . . . . . . . .

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, Greene County Prosecutor's Office, Appellate Division, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 100 North Detroit Street, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After a jury trial in the Greene County Court of Common Pleas, Thomas W. Lawson was found guilty of possession of a fentanyl-related compound, trafficking in a fentanyl-related compound, trafficking in heroin, aggravated possession of drugs (methamphetamine), and two counts of possession of heroin.   The two trafficking offenses contained firearm specifications.   After merging certain offenses and the firearm specifications, the trial court imposed an aggregate term of a minimum of 12 years in prison with a maximum term of 17.5 years.

{¶ 2} Lawson appeals from his convictions.   He claims that the trial court erred in failing to continue the jury trial and to appoint new counsel, that his trial counsel rendered ineffective assistance, and that his convictions were not based on sufficient evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 3} On June 21, 2019, Lawson was arrested in Greene County and the car he was driving at the time of his arrest was impounded by the Riverside police due to an investigation in that Montgomery County jurisdiction.   In a subsequent interview, Lawson informed a Riverside detective that he (the detective) would find guns and drugs in the vehicle.   Based on Lawson's statements, the detective obtained a search warrant for the car.   Upon searching the vehicle, the detective located approximately 68 grams of heroin and fentanyl in one baggie, 5.5 grams of Tramadol, heroin, and fentanyl in a second baggie, and 3.6 grams of methamphetamine in a third baggie.   Officers also located a digital scale and two guns, among other items, in the vehicle.

{¶ 4} On August 30, 2019, Lawson was indicted in Greene County on eight counts:

| Count | Offense | Statute | Degree | Firearm Spec? |
|-------|---------|---------|--------|---------------|
| 1 | Improper Handling of Firearms in a Motor Vehicle | 2923.16(B) | F4 | |
| 2 | Possession of a fentanyl-related compound | 2925.11(A) | F1 | |
| 3 | Trafficking in a fentanyl-related compound | 2925.03(A)(2) | F1 | Yes |
| 4 | Possession of heroin | 2925.11(A) | F1 | |
| 5 | Trafficking in heroin | 2925.03(A)(2) | F1 | Yes |
| 6 | Aggravated possession of drugs | 2925.11(A) | F3 | |
| 7 | Possession of heroin | 2925.11(A) | F3 | |
| 8 | Escape | 2921.34(A)(1) | F2 | |

The indictment also included a forfeiture specification related to the two firearms.

{¶ 5} Lawson appeared with appointed counsel for his arraignment via video. He pled not guilty, and the court set a trial date of November 12, 2019. On November 8, Lawson moved for a continuance, stating that negotiations with the State were ongoing and the State needed additional time to confirm information provided by Lawson. The trial court rescheduled the trial for January 13, 2020. On November 25, the trial court again rescheduled the jury trial for February 18, 2020.

{¶ 6} On January 21, 2020, the Ohio Supreme Court suspended Lawson's defense counsel from the practice of law for two years, with the second year stayed if he met certain conditions.[1] *See Dayton Bar Assn. v. Sullivan*, 158 Ohio St.3d 423, 2020-Ohio-124, 144 N.E.3d 401. Eight days later, an assistant public defender moved to be substituted as counsel for Lawson. The trial court granted the motion. A status conference was scheduled for February 6; that conference was not transcribed.

---

[1] Lawson's appellate counsel has filed a motion asking us to take judicial notice of original defense counsel's suspension from the practice of law. That motion is granted.

{¶ 7} On February 7, the trial court held a *Lafler* hearing.[2] The prosecutor informed the court that the State had presented two plea offers, one with a stipulated sentence and one without. Defense counsel agreed that he had received those offers and had conveyed them to Lawson. Lawson indicated that he wanted to reject both offers. The court noted that trial was scheduled for February 18 and that defense counsel previously had conveyed that Lawson wanted to keep the trial date. When asked if that was correct, Lawson responded, "Yes, sir."

{¶ 8} The trial court asked defense counsel if he would be prepared for trial on February 18. Counsel responded:

Well, your Honor, as I had previously indicated, I indicated to Mr. Lawson, I can be ready, but I'm not going to be ready anywhere near to the degree that I would – to the standard that I would hold myself to be ready for a trial in this short amount of time, because you've seen, you've seen the charges. You've seen how much discovery, how many discs and things here (Indicating.)

* * * So, so I told my client, I've informed him that if we don't have a continuance, I won't be as prepared as I feel I should be. I'll do everything

---

[2] The court's scheduling document referred to this hearing as a "*Lafler* hearing," but that is a misnomer. In *Lafler v. Cooper*, 566 U.S. 156, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012), the United States Supreme Court indicated the trial court could have conducted a hearing, at the point after the jury's guilty verdict and before sentencing, to flesh out the defendant's post-verdict and pre-sentencing claim that he had received ineffective assistance in plea negotiations before trial. Here, the court held a hearing to ensure that Lawson was aware of the State's plea offers and accepted or rejected them on the record. While *Lafler* also suggested that courts may take measures to ensure against fabricated claims following the acceptance of a less advantageous plea or a conviction after trial, *id.* at 172, such prophylactic measures are not a true *Lafler* hearing. *See State v. Easterling*, 2019-Ohio-2470, 139 N.E.3d 497, ¶ 25 (2d Dist.), fn.3.

I can – basically there's only so many hours in the day is what I'm saying, and we're compacted. (Indicating.)

As you know, trials of this, you know, type of crime of this nature, we normally have a lot more than two weeks.

{¶ 9} The trial court then addressed Lawson about what his attorney had said. The court told Lawson that the decision to go forward on February 18 or instead postpone the case was up to him. The trial court advised Lawson to talk with his attorney about the trial date, saying "[I]f you want to go forward, we'll go forward. If you want a short postponement, you'll get it. Either decision is good by me." The court emphasized that defense counsel was a "very good lawyer" who was "very experienced in this courtroom" and could "probably answer any question you might have." Lawson discussed his frustration with the plea process and the course of the case. The court responded that it was not involved with the plea negotiations, but it would allow Lawson either to go forward with the scheduled trial or have a brief continuance, depending on what he decided.

{¶ 10} Defense counsel raised three additional issues with the trial court. He informed the court that he was having difficulty obtaining purported exculpatory evidence from original defense counsel. Counsel noted that multiple copies of the evidence existed, and he was trying to obtain it from other sources. Next, counsel noted that he was reviewing discovery and might lose the ability to raise a motion to suppress if the current trial date went forward. Third, counsel emphasized that "none of this mess we have that we're in today was the result of anything that Mr. Lawson has done."

{¶ 11} The parties asked the court about its general rule that plea agreements be

presented to the court by one week before the trial date. The court said that it was suspending that rule due to the extraordinary circumstances in Lawson's case. The court stated that the parties could continue to negotiate a plea if they wished and reiterated that trial was scheduled to proceed on this case, but a continuance would be granted if Lawson decided he wanted a postponement.

{¶ 12} No motions were filed between February 7 and February 18, 2020.

{¶ 13} Prior to the beginning of trial on February 18, Lawson file a motion to sever the escape charge or, alternatively, to waive a jury trial on that charge. The court, counsel and Lawson then had extensive discussions prior to voir dire. Defense counsel told the court that he had spoken with Lawson that morning and explained to Lawson that he could request a continuance, accept a plea offer, or go to trial that morning. Counsel reported that Lawson initially responded with obscenities and a request for new counsel. Counsel informed the court that "at this time, my understanding is that he still does not want to have the trial. He'd like to get new counsel, which I would assume that would be to retain somebody, and it's his desire to not go forward today, and he says that I'm ineffective, haven't been doing different things and that."

{¶ 14} The court turned to Lawson and asked him, "[R]egarding the trial, you ready to go today?" Lawson responded, "Yes, sir." Defense counsel told the court, "Your Honor, that was contrary to what I was told * * *." The court replied that it "got [its] answer" and "let's move on."

{¶ 15} The court had a lengthy conversation with Lawson, in which Lawson expressed his views on the case, the State's conduct with respect to Lawson's cooperation in another unrelated case, and the State's pending plea offer. During the

discussion, Lawson indicated that he had not seen certain discovery in this case. The court discussed with Lawson whether he wanted to waive a jury trial on the escape charge.

{¶ 16} At one point, Lawson asked if his attorney would change if he were to ask for a continuance. Lawson inquired, "[W]hy does my representation level drop from a court appropriated [sic] private practice lawyer who had my best interest to a public defender? Would I still be appointed a new counsel to represent me on the next trial date, or would I have to be stuck with [current defense counsel]?" The court replied, "I don't know the answer to that. I can't answer that right now. I don't know." Lawson stated, "And that's my dilemma because I don't feel based on the lack of time and the lack of communication that I've had with [counsel] that he has my best interest at heart."

{¶ 17} At that point, Lawson again began to discuss whether he believed the State could prove the drug possession charges against him. The trial court indicated that it would sever the escape charge and the trial would proceed on the drug counts. Defense counsel proposed proceeding on the escape charge instead, which he described as "a much more straightforward case."

{¶ 18} After a brief recess, the court indicated that it had a written motion to sever the escape charge and that if the motion were granted, the case would proceed on the drug charges that day. The court asked Lawson if he wanted to do that, and Lawson responded affirmatively. The trial court filed a written entry, granting the motion to sever and stating that the escape charge would be addressed at the subsequent jury trial in another pending case against Lawson, Greene C.P. No. 2019-CR-508.

{¶ 19} At that juncture, the trial court indicated that it was time for the prospective

jurors to be brought in. Lawson immediately asked the court if he could ask a question, namely whether it was "effective fair trial for me to go forward with [defense counsel] as my attorney." The court responded, "Yes." The court took a brief recess before jury selection began.

{¶ 20} After the prospective jurors were questioned and just prior to discussing with counsel any challenges to the prospective jurors, defense counsel informed the court that Lawson had asked him to request a continuance. Defense counsel conveyed that Lawson wanted the continuance "because of the amount of time involved, because of [original defense counsel] issues, [and] the limited amount of time and things." The State opposed the request, saying that this "was all addressed with the Court last week and the week before that." The court denied the motion in light of the State's position.

{¶ 21} At the conclusion of the jury trial, the jury found Lawson guilty of the drug offenses and firearm specifications (Counts Two through Seven). The jury could not reach a verdict on Count One, improper handling of firearms in a motor vehicle, and that charge was dismissed in the court's judgment entry. At sentencing, the trial court merged possession of a fentanyl-related compound (Count Two) with trafficking in a fentanyl-related compound (Count Three) and possession of heroin (Count Four) with trafficking in heroin (Count Five); the court also merged the firearm specifications. The trial court imposed an aggregate term of a minimum of 12 years in prison with a maximum term of 17.5 years.

{¶ 22} Lawson appeals from his convictions, raising three assignments of error.[3]

---

[3] When the notice of appeal was filed, Lawson had not yet been tried for escape. We conclude that the judgment entry on appeal is nevertheless a final appealable order, because the escape count had been formally severed and all other charges had been

We will address them in an order that facilitates our analysis.

### I. Motions for a Continuance and for New Counsel

{¶ 23} In his first assignment of error, Lawson claims that the "trial court erred in not granting a continuance of the jury trial and the motion to appoint new counsel."

### A. Motion for a Continuance

{¶ 24} The Supreme Court of Ohio has adopted a balancing test to guide lower courts in resolving the competing considerations when evaluating a motion for a continuance. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). A trial court should consider (1) the length of the delay requested; (2) whether other continuances have been requested or received; (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether defendant contributed to the circumstances which gave rise to the request for a continuance; and (6) other relevant factors, depending on the unique facts of each case. *E.g., State v. Breneman*, 2d Dist. Champaign No. 2010-CA-18, 2012-Ohio-2534, ¶ 15, citing *Unger* at 67-68.

{¶ 25} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge." *Unger* at 67. Therefore, an appellate court must not reverse a trial court's decision to deny a motion for continuance unless it finds that the trial court abused its discretion. *Id.*; *Frodyma v. Frodyma*, 2d Dist. Greene No. 2013-CA-40, 2014-Ohio-953, ¶ 26. The term "abuse of discretion" implies that the

---

resolved. *See State v. Craig*, 159 Ohio St.3d 398, 2020-Ohio-455, 151 N.E.3d 574, ¶ 24 ("Had the trial court at any point severed the counts of conviction from the still-pending charge, Craig would have been able to appeal his convictions separately.").

court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 26} "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

{¶ 27} Lawson asserts that each of the above factors either was neutral or favored the granting of a continuance. He states that no specific length of a delay was requested, but some amount of a continuance would have been reasonable. Lawson emphasizes that new defense counsel had recently been appointed through no fault of his, and new counsel had not previously sought a continuance. Lawson notes that all of the witnesses were police officers or lab analysts, and no lay witnesses would have been inconvenienced. Lawson further states that "the trial court had previously placed on the record that there were other trials set for that day and the jury that was called in could have been used for those trials so as to not inconvenience the court and those jurors." Lawson emphasizes that he had not seen all of the discovery, he had had minimal in-person communications with his new counsel, and there were pretrial motions that could have been filed.

{¶ 28} This case presents a unique circumstance. Lawson was indicted in August 2019, and it appears that he has been held in jail during the pendency of this case. His original counsel sought a continuance in November 2019, which was granted. Less than a month before the rescheduled February 18, 2020 trial date, Lawson's appointed counsel

was suspended from the practice of law, necessitating new counsel. It is undisputed that Lawson did nothing to create this situation. Lawson repeatedly expressed frustration with the resulting circumstances, specifically that he faced going to trial as scheduled with new counsel or accepting a delay of the trial date. Lawson was unsatisfied with both options.

{¶ 29} At the February 7 hearing, the trial court repeatedly told Lawson that it would either proceed with the scheduled trial date or provide him a short postponement, whichever Lawson wanted. The court encouraged Lawson to talk with his attorney about what he wanted to do. The court stated that, as of February 7, the trial would proceed as scheduled, but "[i]f any time between now and then, you'd like it postponed, I will grant that to you."

{¶ 30} As of February 7, Lawson was also aware of his attorney's concerns about his (counsel's) ability to be prepared for trial on February 18. Counsel had expressed that he would do everything he could to be ready, but would not be ready to the extent that he would normally be ready if he had more time. Counsel had also informed the court that he was having issues obtaining purported exculpatory evidence and there possibly were pretrial motions that needed to be filed.

{¶ 31} Between February 7 and the trial date (February 18), Lawson did not request a continuance, file any pretrial motions, or request new counsel.

{¶ 32} Prior to the jury pool's being brought into court for voir dire on February 18, defense counsel informed the court that he had spoken to Lawson that morning and presented three options to Lawson – accept a plea, request a continuance, proceed with trial; counsel conveyed that Lawson was upset, wanted new counsel, and ultimately

requested a continuance. However, when the trial court asked Lawson directly whether he was ready to proceed to trial that day, Lawson responded affirmatively. Lawson did not request a continuance prior to the commencement of jury selection.

{¶ 33} Jury selection began at 10:25 a.m. and continued until the court took a brief recess at 12:05 p.m. When court resumed at 12:22 p.m. to discuss challenges to the prospective jurors, defense counsel moved for a continuance at Lawson's request. That request was denied.

{¶ 34} Upon review of the record, we cannot conclude that the trial court abused its discretion when it denied Lawson's motion for a continuance made at the conclusion of voir dire. The trial court had spoken with Lawson extensively, both on February 7 and during the 50 minutes prior to the beginning of jury selection on February 18. Although Lawson expressed his dissatisfaction with the course of his case, he did not ask for a continuance during those times, and he expressly told the court on the morning of February 18 prior to voir dire that he was ready to proceed with the trial.

{¶ 35} At one point prior to the beginning of trial, Lawson asked the trial court if he would have the same counsel if he asked for a continuance, "which I think might be the best option at this point." The court responded that it did not know the answer and could not answer that question then. Lawson expressed that his dilemma was based on his lack of confidence in his attorney. The court later told Lawson that it was severing the escape charge and that trial that day would proceed on the drug and gun charges only, and it asked Lawson, "Would you like to do that, Mr. Lawson?" Lawson responded affirmatively.

{¶ 36} The trial court could have reasonably concluded that Lawson's request for

a continuance after almost two hours of voir dire was untimely and that the inconvenience to the court, the parties, and the public outweighed other considerations. Although the trial court possibly could have proceeded with trial in another case had a continuance been granted earlier, other scheduled trials undoubtedly had been reset by the time Lawson's motion was made shortly after noon on February 18.

{¶ 37} We recognize that Lawson was placed in the unfortunate position of having his defense counsel changed within a month of his trial date for reasons outside of his control. New defense counsel was clear that the short timeframe until trial would hamper his preparation and that he was having difficulty with obtaining purportedly exculpatory evidence from former defense counsel. Defense counsel's statements indicated that he (counsel) believed a continuance was preferable. The trial court offered Lawson the choice to proceed with the trial date or to request a continuance prior to trial. Before trial began, Lawson himself indicated that he wanted to proceed on February 18. Once the trial process began and jury selection was almost completed, we cannot find error in the trial court's denial of Lawson's motion for a continuance, which appeared to be based simply on a change of heart about whether to proceed.

{¶ 38} The portion of Lawson's first assignment related to his motion for a continuance is overruled.

### B. Motion for New Counsel

{¶ 39} "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate * * * rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *State v. Jones*, 91 Ohio St.3d 335, 342,

744 N.E.2d 1163 (2001), quoting *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

{¶ 40} In reviewing whether a trial court erred in denying a defendant's motion for new counsel, an appellate court should consider "the timeliness of the motion and whether there was a conflict between the attorney and the client that was so great that it resulted in a total lack of communication preventing an adequate defense." *Jones* at 342, quoting *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996). "In addition, courts should 'balanc[e] * * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.' " *Id.* at 342-343.

{¶ 41} We review the trial court's decision whether to grant a defendant's motion for new counsel for an abuse of discretion. *Breneman*, 2d Dist. Champaign No. 2010-CA-18, 2012-Ohio-2534, at ¶ 14; *Jones* at 343.

{¶ 42} Lawson claims that the trial court erred in failing to grant his motion for new counsel. In its appellate brief, the State asserts that Lawson never requested a new attorney and, therefore, it was not an abuse of discretion for the trial court to fail to appoint new counsel sua sponte. The record presents a complicated picture.

{¶ 43} On the morning of trial, defense counsel began the pretrial discussion by informing the court that he had spoken with Lawson about his options, and that Lawson had expressed a desire for a continuance and new counsel and had complained that defense counsel was ineffective. Defense counsel's statements, made on Lawson's behalf, constituted an oral motion for new counsel. However, the court then asked Lawson if he was ready to go to trial that day. Lawson responded affirmatively. The trial court reasonably interpreted Lawson's response as a repudiation of his prior

statements to his defense counsel that he wanted both a continuance and a new attorney.

{¶ 44} At that point, the trial court raised with Lawson the idea of having a bench trial on the escape charge. Lawson told the court that defense counsel had explained the State's proposal to "dismiss" the escape charge as a part of a plea deal. (Defense counsel disputed Lawson's characterization of the conversation.) Lawson then expressed his views on the strength of the State's case on the drug charges. When the court said, "Well, that's what a trial is all about," Lawson criticized his defense counsel, saying:

Exactly. And I've tried to explain this to my attorney. [Counsel] come to me, and he says, I'm here to clean up this mess – not defend you, Mr. Lawson – clean up this mess.

At no point has he shown me the DVDs against me, nothing – none of the evidence against me. Absolutely nothing has went against – in my defense. This was all on my own behalf in my defense (Indicating.) * * *

{¶ 45} When the court asked Lawson if he had all the discovery, Lawson stated that he did not have any of the DVDs, including his conversation with the Riverside police. Lawson then stated that he did not understand why Montgomery County did not bring the drug charges. The court again responded that a trial would address that. Lawson replied:

Well, I would like to, I would like to discuss this with my attorney, but it's not about what we discussed. It's about how they didn't make a deal with me on Dave Simpson. They didn't make a deal with me on Calvin Harbaugh. It's all about. It's never been about my case whatsoever.

Lawson then expressed his frustration about how the State handled the information that he said he had provided regarding an unrelated murder case, claiming that the State made him a known snitch. Lawson had expected a deal in this case based on his cooperation. Lawson stated that he "wanted [defense counsel] to be able to be the liaison." (Trial Tr. at 20.)

{¶ 46} The trial court then tried to bring the conversation back to that day's proceedings. Lawson asked why his representation level "dropped" from a private attorney to a public defender and whether he would be appointed new counsel for trial if he asked for a continuance. Lawson also stated that, "based on the lack of time and the lack of communication" that he had had with counsel, he did not feel that counsel had his "best interest at heart." Just prior to jury selection, Lawson asked the court, "[I]s it effective fair trial for me to go forward with [defense counsel] as my attorney[?]" (The court responded, "Yes.")

{¶ 47} Lawson did not make an explicit request for new counsel after his initial request (via counsel) at the beginning of the lengthy pretrial discussion. However, the record reflects that Lawson was not satisfied with the communication between his attorney and him, and that he believed that his defense counsel would not provide a high level of representation simply because counsel was a public defender. His questions about whether he would receive new counsel if he requested a continuance and whether it was fair for him to proceed to trial with current defense counsel reasonably could be construed as requests for new counsel.

{¶ 48} Despite Lawson's expressed concerns, the record does not reflect that Lawson was unwilling to work with his attorney or that any conflicts between him and his

attorney were "so great that it resulted in a total lack of communication preventing an adequate defense." *Jones*, 91 Ohio St.3d at 342, 744 N.E.2d 1163. That morning, Lawson and his attorney had discussed the options available to Lawson, namely the State's pending plea offer, a continuance, or proceeding to trial. Although defense counsel took issue with how Lawson, in layman's terms, described the content of their conversations, the trial court could have reasonably concluded that defense counsel could communicate adequately about the case and that defense counsel could provide effective assistance to Lawson. We cannot conclude that the trial court abused its discretion in failing to appoint Lawson new counsel on the date of trial.

{¶ 49} The portion of Lawson's first assignment of error related to his motion for new counsel is overruled.

## II. Sufficiency of the Evidence

{¶ 50} In his third assignment of error, Lawson claims that his convictions were based on insufficient evidence for two reasons. First, he asserts that the evidence at trial established that there was an issue with the chain of custody of the evidence. Second, he asserts that the State failed to prove that he trafficked in drugs.

{¶ 51} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio

St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 52} The State's evidence at trial established the following facts.

{¶ 53} Late in the evening of June 21, 2019, Deputies Michael Major and Jason Davis of the Greene County Sheriff's Office were looking for Lawson on an unrelated incident. They first attempted to locate Lawson at his residence, but he was not there. At approximately 11:30 p.m., the deputies were talking by the entrance to the Huber Mobile Home Trailer Park, in separate cruisers, when they saw Lawson enter that location in a silver Nissan Altima. Lawson passed the deputies' cruisers. The deputies followed Lawson to the furthest street. Lawson was getting out of the Altima when Deputy Major pulled up, and Deputy Davis saw him standing beside the vehicle.

{¶ 54} The deputies briefly talked with Lawson about the incident they were investigating. Deputy Major then arrested Lawson and transported him to the Greene County Jail, leaving Deputy Davis at the scene. Deputy Major did not know if the Altima was locked. Deputy Davis left shortly afterward. Davis testified that he believed the Nissan Altima was locked, but he was not certain. Davis stated on redirect examination that it was the policy of the Greene County Sheriff's Office to secure legally parked vehicles when the drivers are arrested. (He stated that the vehicle would have been towed if it were not legally parked.)

{¶ 55} Deputy Davis headed "back out to Xenia to do some paperwork." As he was driving toward Xenia, he received a call from his dispatcher to contact the Riverside Police Department. Deputy Davis spoke with a Riverside officer, who wanted to know if

he knew the location of Lawson's vehicle. Davis informed the officer where the Nissan was located. Based on the phone call, Deputy Davis drove to the Greene County Jail in Xenia to get the keys to the Altima from Deputy Major. Deputy Davis then headed back to the Nissan's location. Davis estimated that 15 to 20 minutes elapsed between his leaving the scene and the call from Riverside officer.

{¶ 56} Officer Robert Todd[4] of the Riverside Police Department testified that he learned of Lawson's arrest at approximately 11:34 p.m. Shortly after that, Todd received information about the location of Lawson's vehicle, and he headed to the Huber Mobile Home Trailer Park. Officer Todd explained that Lawson was operating a vehicle that Riverside officers wanted to have towed as part of an investigation. Todd arrived at the scene approximately 10 to 15 minutes later; no other law enforcement officers were there.

{¶ 57} Deputy Davis met Officer Todd at the scene and provided him the keys to the Altima. Davis stated that it took roughly an hour to get from the location of the Nissan to Xenia and back; Davis did not know how long Todd had been waiting. Davis stated that the Nissan did not look any different when he returned. Officer Todd had not attempted to open the vehicle and did not know if it was locked.

{¶ 58} Officer Todd secured the Altima by placing evidence tape along the creases of the doors, trunk, and hood, and then initialing the tape. Officer Todd arranged for the car to be towed to Sandy's Towing in Dayton. The officer was aware that Lawson was not the registered owner of the vehicle.

---

[4] At trial, Todd identified himself as a detective with the Riverside Police Department. He stated, however, that he was a road patrol officer on June 21, 2019, when the relevant events occurred.

{¶ 59} Riverside Detective Kyle Sewert [5] spoke to Lawson. During their conversation, Lawson told the detective that drugs and guns might be found in the silver Nissan Altima. On cross-examination, Sewert testified that Lawson indicated that approximately two ounces of drugs were in the car. The Riverside police obtained a search warrant for the car, and the vehicle was towed from Sandy's to the Riverside Police Department.

{¶ 60} On June 26, 2019, Detective Sewert conducted the search of the Nissan Altima. He indicated that the vehicle was locked and had secured tape on all seams of the vehicle, including the trunk and front and rear doors. During the search, Sewert located a firearm with a loaded magazine in the driver's door, another firearm with a loaded magazine and a round in the chamber in the trunk, a lunch pail with suspected drugs and a digital scale behind the passenger seat, and a blow torch lighter on the front passenger seat. Sewert clarified that the lunch pail contained three separate baggies of suspected drugs.

{¶ 61} Sewert stated that he packaged the evidence, secured it in the property room of the police department, and made an inventory of the items removed from the vehicle. He gave the firearms to the property room custodian, who is certified with firearms, to test the firearms for operability; the weapons were then secured in the firearms box.

{¶ 62} Sewert testified that the presence of a digital scale in close proximity to drugs is indicative of "selling of narcotics to get proper measurements and weights of

---

[5] Sewert testified that he had since left the Riverside Police Department and was a public safety officer for the city of Oakwood at the time of trial.

what's being distributed." He indicated that the blow torch lighter can be used as a heat source for inhaling narcotics.

{¶ 63} Daniel Brodnick, a former police officer and then property room manager at the Riverside police station, testified about the procedures used to submit evidence to the property room and the procedures to track the submitted evidence, including assigning the evidence a specific case number and logging it with a software program. For each item of evidence, the software included a description and quantity. Brodnick identified the evidence submitted to the Riverside property room in this case, which included a .45 caliber Ruger pistol, a .40 caliber Ruger pistol, three baggies containing suspected drugs, a blow torch lighter, a lunch pail, and .40 and .45 caliber cartridges.

{¶ 64} Brodnick testified that he was a firearm instructor at the Riverside Police Department, and he test-fired the two Ruger pistols collected in this case at Detective Sewert's request. Brodnick stated that both weapons operated as should have; there were no malfunction problems or corrosion or other issues that would interfere with the functioning of the firearms. He returned the guns to Detective Sewert to seal and initial and then submit into evidence. The bullet casings from the testing of the weapons were also submitted to the property room as evidence.

{¶ 65} On July 2, 2019, Brodnick transported the drugs and guns to BCI for analysis. After testing by BCI, Brodnick retrieved the evidence from BCI and logged it back into the Riverside property room. The guns and drugs later were released to Detective Kelly Edwards of the Greene County Sheriff's Office.

{¶ 66} Pamela Farley, a forensic scientist in drug chemistry at BCI, testified how evidence is received and tracked at BCI. Farley stated that she tested three baggies

with unknown substances, which were submitted to BCI by Brodnick on July 2, 2019. The substance in the first baggie was 68.05 grams, plus or minus 0.04 grams, of a powder containing heroin and fentanyl. The second baggie contained 5.46 grams, plus or minus 0.04 grams, of a white powdery solid material containing Tramadol, heroin, and fentanyl. The third baggie contained 3.65 grams, plus or minus 0.04 grams, of a clear crystalline material found to contain methamphetamine. The evidence was returned to the Riverside Police Department.

{¶ 67} Farley testified that heroin is a Schedule I drug, fentanyl and methamphetamine are Schedule II drugs, and Tramadol is a Schedule IV drug. Farley stated that the bulk amount for methamphetamine is three grams.

{¶ 68} Detective Kelly Edwards testified that she fills in for the property room manager at the Greene County Sheriff's Office when the property room manager is on vacation. Edward testified that on September 3, 2019, she received evidence from Brodnick, placed the evidence in an evidence bag, sealed the bag, and initialed it. Edwards then put the evidence in a property room locker, logged it, and generated a report. The parties stipulated to the chain of custody of that evidence after it was submitted to the sheriff's office.

{¶ 69} Captain Sean Magoteaux of the Greene County Sheriff's Office, who has experience in drug investigations, testified that the drug trade is very dangerous, and handguns frequently are found during the course of drug investigations. He stated that people carry guns for various reasons, including for self-defense or to rob others of their money and guns. Captain Magoteaux discussed the conversion of grams to ounces and testified that 77 grams, or 2.7161 ounces, of drugs were found in this case. Captain

Magoteaux further testified that he had listened to recorded telephone conversations between Lawson and other individuals. During the calls, which were placed after Lawson's arrest, Lawson made statements that he took the car because the drugs were in there and he thought he could make some money. Magoteaux interpreted Lawson's statements to mean that he planned to sell the drugs that were in the car. Magoteaux also heard a phone call between Lawson and his mother in which Lawson stated that he had ruined his life for some drugs.

{¶ 70} Magoteaux acknowledged on cross-examination that he did not know how the drugs got in the vehicle or who placed them in the vehicle. Magoteaux also stated on recross-examination that a person with drugs might leave the drugs somewhere (not on their person) to protect the drugs.

{¶ 71} Magoteaux and Sewert both addressed why the charges in this case were brought in Greene County. They emphasized that Lawson and the vehicle were located in Greene County, Lawson was arrested in Greene County, and the vehicle was secured in Greene County. Sewert stated that he never saw Lawson in the Altima in Montgomery County.

{¶ 72} After deliberations, the jury found Lawson guilty of possession of a fentanyl-related compound, trafficking in a fentanyl-related compound, trafficking in heroin, aggravated possession of drugs, and two counts of possession of heroin. The jury also found Lawson guilty of the firearm specifications attached to the trafficking offenses. The jury did not reach a verdict on improper handling of a firearm in a motor vehicle.

**A. Possession of Drugs / Chain of Custody**

{¶ 73} R.C. 2925.11(A), which defines drug possession, states: "No person shall

knowingly obtain, possess, or use a controlled substance." Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 74} " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession of a drug may be either actual physical possession or constructive possession. *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18. "A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession." (Citations omitted.) *Id.* at ¶ 18. "Establishment of ownership is not required." *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 33. In determining whether an individual possessed an item, it is necessary to consider all of the facts and circumstances surrounding the incident. *Mabry* at ¶ 20.

{¶ 75} Lawson first claims that his convictions were based on insufficient evidence, because the evidence indicated that the State failed to ensure the chain of custody of the drugs found in the Altima. He argues that there was a period of time that the Nissan was left unattended by law enforcement, that the officers were not certain that the vehicle was locked, and that other individuals could have accessed the vehicle during this time.

{¶ 76} As part of the authentication and identification requirements of Evid.R. 901,

the State bears the burden of establishing the chain of custody of any evidence that is fungible and indistinguishable by nature. *See, e.g.*, *State v. Ramos*, 2d Dist. Montgomery No. 28214, 2019-Ohio-3588, ¶ 22-23. However, the State is not required to prove "a perfect, unbroken chain of custody." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 57, quoting *State v. Keene*, 81 Ohio St.3d 646, 662, 693 N.E.2d 246 (1998). "In order to meet its burden in establishing the chain of evidence, 'the state need only establish that it is reasonably certain that substitution, alteration, or tampering did not occur.' " *State v. Rajchel*, 2d Dist. Montgomery No. 19633, 2003-Ohio-3975, ¶ 21, quoting *State v. Qualls*, 2d Dist. Clark No. 1996-CA-68, 1997 WL 311634, *5 (June 6, 1997); *State v. Maranger*, 2018-Ohio-1425, 110 N.E.3d 895, ¶ 74 (2d. Dist.).

**{¶ 77}** Challenges to the chain of custody of an item "go to the weight to be afforded the evidence, not to the admission of the evidence." *Gross* at ¶ 57, citing *State v. Richey*, 64 Ohio St.3d 353, 360, 595 N.E.2d 915 (1992); *see also, e.g., Ramos* at ¶ 25; *State v. Wiley*, 2d Dist. Darke No. 2011-CA-8, 2012-Ohio-512, ¶ 13.

**{¶ 78}** Lawson's argument on appeal does not challenge the admissibility of the drugs found in the Altima, and he does not question the chain of custody of the drugs once Officer Todd secured the vehicle at the scene. (Lawson did not object to the admission of the drugs and guns at trial.) Rather, he claims that the State's evidence was insufficient to prove that the drugs found during the Riverside search also were located in the Altima when Lawson was driving the vehicle and that he knowingly possessed those drugs.

**{¶ 79}** Construing the evidence in the light most favorable to the State, we find sufficient evidence that Lawson knowingly possessed the drugs found by Detective

Sewert during the search of the Altima. Prior to the search of the vehicle, Lawson told Detective Sewert that the Altima contained drugs and guns. Lawson stated in a subsequent recorded telephone call that he had taken the car because the drugs were in there and he thought he could make some money. The State thus presented evidence that drugs were located in the vehicle prior to and while Lawson was driving the car and that he knowingly possessed drugs.

{¶ 80} The search of the vehicle located a closed lunch pail with drugs inside. The lunch pail was found behind the passenger seat. No other drugs were found inside the vehicle. Sewert testified that the Altima was both locked and secured with tape when he began his search of the vehicle. The jury could have reasonably concluded that the drugs found by Detective Sewert were the drugs that Lawson had mentioned and that additional drugs were not added to the vehicle.

{¶ 81} Finally, even assuming for sake of argument that the vehicle was not locked, the evidence established that the vehicle was left unattended for a limited period of time. Deputies Major and Davis encountered Lawson at approximately 11:30 p.m. on June 21, 2019. After a brief interaction, Lawson was arrested and transported to jail by Deputy Major. Davis also left the scene. Although Davis was not certain, he believed the Altima was locked. Officer Todd learned of Lawson's arrest at 11:34 p.m. on June 21; he learned of the location of the vehicle shortly thereafter. Todd headed to the Huber Mobile Home Park, arriving 10 to 15 minutes later. Deputy Davis later returned to the scene with the keys to the Altima and found Officer Todd waiting. When Davis returned, the Altima appeared to be in the same condition as when Davis had left. The timing of events further supported a reasonable conclusion that there was little likelihood that someone

had tampered with the Nissan Altima between Deputy Davis's initial departure from the scene and Officer Todd's arrival.

{¶ 82} In sum, construing the evidence in the light most favorable to the State, the State's evidence was sufficient to establish that all of the drugs located during Sewert's search of the Altima were in the Altima when Lawson was driving the vehicle and that Lawson knowingly possessed those drugs.

## B. Drug Trafficking

{¶ 83} Lawson also claims that the State failed to present sufficient evidence that he committed drug trafficking.

{¶ 84} Lawson was convicted of trafficking in a fentanyl-related compound and trafficking in heroin, both in violation of R.C. 2925.03(A)(2).   That provision reads:

(A) No person shall knowingly do any of the following:

* * *

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or

distribute a controlled substance or a controlled substance analog, when

the offender knows or has reasonable cause to believe that the controlled

substance or a controlled substance analog is intended for sale or resale by

the offender or another person.

{¶ 85} Lawson argues that the only evidence to support the drug trafficking convictions was the testimony of Captain Magoteaux, which was "speculative and objectionable."   Lawson claims that there was no evidence of "actual proof of trafficking" or that he knowingly transported the drugs for purposes of trafficking.

{¶ 86} At the outset, in reviewing challenges based on the sufficiency and/or

manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.). Whether defense counsel should have objected to any portion of Captain Magoteaux's testimony is immaterial to Lawson's sufficiency argument.

{¶ 87} The State's evidence established that three baggies of drugs were found in a closed lunch pail in the Nissan Altima. Those baggies consisted of (plus or minus 0.04 grams): 68.05 grams of a powder containing heroin and fentanyl; 5.46 grams of a white powdery solid material containing Tramadol, heroin, and fentanyl; and 3.65 grams of a clear crystalline material found to contain methamphetamine. The bulk amount of methamphetamine is three grams. A digital scale was found with the drugs. Detective Sewert testified that the presence of a digital scale in close proximity to drugs is indicative that the drugs are intended to be weighed and divided for sale.

{¶ 88} In addition, Captain Magoteaux testified that Lawson admitted in a phone conversation that he had taken the Altima because it contained drugs and he thought he could make money. Lawson's statement reasonably indicated that he knowingly transported the drugs in the car with the intention of selling them. Construing the evidence in the light most favorable to the State, the State presented sufficient evidence that Lawson had engaged in drug trafficking.

{¶ 89} Lawson's third assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 90} In his second assignment of error, Lawson claims that he was denied the

effective assistance of counsel. Lawson asserts (1) that the circumstances were such that no experienced attorney could have provided effective assistance and (2) that viewing defense counsel's specific conduct, counsel acted deficiently in several respects, to Lawson's prejudice.

### A. Presumption of Prejudice

{¶ 91} We begin with Lawson's assertion, emphasized in his reply brief, that the short time period between defense counsel's formal appointment on February 5 and trial on February 18 was presumptively prejudicial and resulted in the denial of his Sixth Amendment right to counsel.

{¶ 92} The United States Supreme Court has described the essence of the right to the effective assistance of counsel as "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The Court continued: "When a true adversarial criminal trial has been conducted — even if defense counsel may have made demonstrable errors — the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (Footnotes omitted.) *Id.* at 656-57.

{¶ 93} The defendant generally bears the burden to establish that he or she was prejudiced by counsel's conduct.

Nonetheless, *Cronic* recognized that some circumstances are so likely to prejudice the defendant that no showing of prejudice is necessary. These include "the complete denial of counsel * * * at a critical stage of [the] trial" and the complete failure of counsel "to subject the prosecution's case

to meaningful adversarial testing." "Ineffectiveness is also presumed when counsel 'actively represented conflicting interests.' " Also included are such extreme cases as *Powell v. Alabama* (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, where defense counsel was appointed only a few minutes before the trial commenced.

"Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."

(Citations omitted.) *State v. Sanders*, 92 Ohio St.3d 245, 277, 750 N.E.2d 90 (2001), quoting *Cronic*. Only when the surrounding circumstances make it "so unlikely that any lawyer could provide effective assistance" is prejudice "presumed without inquiry into actual performance at trial." *Cronic* at 661.

{¶ 94} In *Cronic*, the defendant faced charges of mail fraud involving the transfer of over $9,400,000 in checks between banks in two states over a 4-month period. After retained counsel withdrew shortly before trial, the trial court appointed a young real estate lawyer with no prior jury trial experience, but allowed him only 25 days for pretrial preparation. In contrast, the government took over four and one-half years to investigate the case and had reviewed thousands of documents during that investigation; the defendant's two co-defendants had agreed to testify against him. Using five criteria[6] and

---

[6] The criteria used by the Tenth Circuit were (1) the time afforded for investigation and preparation; (2) defense counsel's experience; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel. *United States v. Cronic*, 675 F.2d 1126, 1129 (10th Cir.1982).

without considering defense counsel's actual performance, the court of appeals reversed Cronic's conviction, concluding Cronic's constitutional right to the effective assistance of counsel had been violated.

{¶ 95} The United States Supreme Court reversed the appellate court. The Court stated that "[t]he five factors listed in the Court of Appeals' opinion are relevant to an evaluation of a lawyer's effectiveness in a particular case," but the factors did not, separately or in combination, support the conclusion that competent counsel was unable to provide Cronic effective assistance. *Cronic* at 663. Upon reviewing the factors, the court held that Cronic's case was "not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." *Id.*

{¶ 96} Lawson relies on the dissent in *State v. Robinson*, 2d Dist. Clark No. 2013-CA-69, 2014-Ohio-3645. In *Robinson*, defense counsel (a public defender) sought to withdraw because a witness disclosed by the State was also represented by the Public Defender's Office. The court held the motion in abeyance and continued the trial date to July 15. On July 11, Robinson appeared with a different attorney and waived his right to a jury trial. The parties agreed that the trial court permitted the substitution of counsel on July 11. A bench trial began on July 15, as scheduled. In preliminary remarks, the prosecutor noted the "very brief period of time" that defense counsel had to prepare, but stated that defense counsel had been in contact with the prosecutor when the matter was first indicted and that the prosecutor believed that defense counsel had met with Robinson several times at the jail. Defense counsel affirmatively stated that he was prepared to proceed and opposed a motion by the State for a continuance.

{¶ 97} On appeal, Robinson claimed that "no attorney could have effectively defended him" when there was so little time between counsel's appointment and trial. The majority opinion rejected that argument, stating: " Although the time between counsel's acknowledgment as the attorney of record and the trial was very short, counsel had previously been aware of and involved in the case to some degree, and there is no basis to conclude that counsel was not prepared to proceed on the day of trial. Counsel affirmatively stated that he was ready to proceed. Under these circumstances, the trial court did not abuse its discretion in proceeding to trial." *Robinson* at ¶ 37. *Contrast State v. Blair*, 171 Ohio App.3d 702, 2007-Ohio-2417, 872 N.E.2d 986, ¶ 16 (2d Dist.) ("Given the fact that defense counsel admittedly did not prepare, and then sat silently by as Blair was convicted without any defense whatsoever, it can be presumed that appellant was prejudiced by defense counsel's inaction, thereby warranting a finding of ineffective assistance of counsel.").

{¶ 98} The dissenting opinion in *Robinson* first noted that defense counsel had waived a jury trial on the day of his appointment, without the benefit of having received and reviewed the State's discovery. *Robinson* at ¶ 41 (Donovan, J., dissenting). The dissent further concluded that "it is wholly unreasonable to suggest or conclude that even the most talented, experienced defense attorney can prepare a first degree felony rape trial in three days." *Id.* at ¶ 42. The dissenting judge reasoned:

> In my view, Robinson was denied his Sixth Amendment right to counsel, given the inexplicable delay in change of counsel, immediate jury waiver, and ridiculously brief period of time between appointment and trial. While "the Constitution nowhere specifies any period which must intervene

between the required appointment of counsel and trial," the Court has recognized that "the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel." *Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940).

*Robinson* at ¶ 42 (Donovan, J., dissenting).

**{¶ 99}** Although Lawson focuses on the dissenting opinion in *Robinson*, this court's precedent was set forth in the majority opinion, and as the dissenting judge recognized, *Robinson* presented "a highly fact sensitive case." *Id*. at ¶ 44. Indeed, the circumstances here are factually distinguishable and do not create a presumption of prejudice.

**{¶ 100}** In this case, the assistant public defender sought to be substituted as defense counsel on January 29, 2020, three weeks before the trial date. On February 4, 2020, prior to the trial court's action on that motion, the assistant public defender signed a request for discovery and acknowledgement of receipt of discovery from the State. The State served the assistant public defendant with its motion to sever Case No. 2019-CR-508 from Case No. 2019-CR-555 (this case). On February 5, the assistant public defender received plea offers from the State. The court filed its entry approving the substitution of counsel on the same day (February 5, 2020).

**{¶ 101}** At the February 7 hearing, new defense counsel informed the court that he had spoken with Lawson at the jail and conveyed the State's plea offers. Lawson

also stated that he had spoken with his attorney that morning about the pros and cons of those offers. Defense counsel acknowledged at the hearing that he had received discovery from the State; counsel was having difficulty obtaining purported exculpatory evidence, which the State did not have, from former defense counsel. Counsel told the court that he would try to obtain that evidence from alternate sources. (Those efforts were unsuccessful.)

{¶ 102} Lawson informed the trial court on February 7 that he wanted to proceed with the February 18 trial date. When the trial court asked defense counsel if he would be prepared on February 18, counsel responded that he "can be ready," although not "to the standard that I would hold myself to be ready for trial in this short amount of time." Counsel noted the extensive discovery he needed to review. Counsel told the court that he would "do everything I can – basically there's only so many hours in the day is what I'm saying * * *. As you know, trials of this, you type of crime of this nature, we normally have a lot more advance than two weeks."

{¶ 103} Lawson went to trial on seven counts, including first-degree felony offenses, but all of the offenses stemmed from the presence of drugs and guns in the vehicle that Lawson had been driving. Although defense counsel apparently had substantial discovery to review, the factual circumstances were not complex. While defense counsel would have liked additional time to prepare for trial, he indicated that he would work hard to be ready and "can be ready." The record shows that defense counsel had minimal communication with Lawson between his appointment and trial, but there was nothing in the circumstances of counsel's appointment that made the lack of communication inevitable. Although not ideal, the circumstances did not make it unlikely

that Lawson could have received the effective assistance of counsel. In short, the circumstances in this case did not rise to the magnitude of creating a presumption of prejudice.

**B. Specific Allegations of Deficient Performance**

{¶ 104} Turning to Lawson's specific allegations of deficient performance, Lawson claims that his trial counsel rendered ineffective assistance in the following respects: (1) counsel did not review discovery with Lawson, (2) counsel did not obtain potentially exculpatory videos that were in the possession of third parties, (3) counsel did not know what charges would go forward on the day of trial, (4) counsel failed to communicate adequately with Lawson, (5) counsel did not adequately prepare for trial, (6) counsel failed to file pretrial motions to suppress and/or in limine, (7) counsel failed to object to testimony about other investigations, (8) counsel failed to object to references that Lawson was in possession of "ounces" of drugs, rather than "grams" of drugs, (9) counsel misstated the conversion of ounces to grams during cross-examination, and (10) counsel failed to object to testimony that a witness (Captain Magoteaux) recognized Lawson's voice in jail phone calls.

{¶ 105} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's

perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 106} A trial attorney's failure to communicate with his or her client may rise to the level of deficient performance, depending on the circumstances. The record reflects that defense counsel spoke with Lawson about the State's plea offers prior to the February 7 hearing and that he spoke with Lawson on the morning of February 18, prior to the beginning of the on-the-record pretrial discussion and trial. The full extent of those communications is not reflected in the record. As we have previously said, "a claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record. It relies upon information necessarily outside the record, and is therefore not an issue we can review on direct appeal." *State v. Watters*, 2016-Ohio-8083, 76 N.E.3d 723, ¶ 27 (2d Dist.). *See also State v. Olds*, 2d Dist. Miami No. 2019-CA-9, 2020-Ohio-1528, ¶ 11. Because the content of Lawson's and defense counsel's communications are not fully detailed in the record, Lawson's claim regarding lack of communication is more properly raised in a petition for post-conviction relief.

{¶ 107} As for the alleged failure to review discovery with Lawson, Lawson stated prior to trial on February 18 that, "[a]t no point has [defense counsel] shown me the DVDs against me, nothing – none of the evidence against me." Counsel did not respond to this comment. Between September 2019 and January 2020, however, Lawson was represented by different counsel, who had received the State's discovery on October 11,

2019. At times, Lawson lamented that he did not proceed to trial with his former counsel on November 12, 2019, the original trial date. Although Lawson states that his substitute defense counsel did not review the State's discovery with him, the record does not reflect whether Lawson previously reviewed it with his former counsel, and Lawson does not articulate how he was prejudiced by defense counsel's alleged conduct. Accordingly, on this record, we cannot determine whether substitute defense counsel's alleged failure to provide Lawson with the State's discovery and to review it with him was prejudicial.

{¶ 108} Next, Lawson claims that counsel rendered ineffective assistance by failing to obtain exculpatory videos. On February 7, 2020, defense counsel told the trial court that he was having trouble getting potentially exculpatory videos from original defense counsel and would try to obtain the videos from other individuals, including another lawyer. On February 18, the trial date, defense counsel informed the court that he had tried to obtain the potentially exculpatory videos from two sources, but one (the lawyer) did not respond and the other denied that he had a copy of the video. Those videos, assuming they exist, are not part of the record on appeal. Without the videos, we cannot determine whether the videos would have affected the outcome of the trial and thus whether Lawson was prejudiced by defense counsel's failure to obtain them and use them at trial. Again, this claim cannot be reviewed on direct appeal.

{¶ 109} Lawson asserts that his counsel was deficient because he did not know what charges would go forward on the day of trial. That assertion oversimplifies the record. On February 18, 2020, Lawson appeared for trial on the eight charges indicted in this case. The same day, defense counsel filed a motion to sever Count Eight, escape. The trial court, Lawson, defense counsel, and the prosecutor had a lengthy discussion

about whether the escape count should be severed and which charges of the indictment, if any, should proceed to trial that day. Prior to the beginning of voir dire, Lawson had elected to proceed to trial, the trial court severed the escape charge, and the court ruled that trial would proceed on the drug and gun charges (Counts One through Seven). Although there was some discussion about which charges would proceed to trial on February 18, there is no indication that defense counsel was confused about the charges and acted deficiently.

{¶ 110} Lawson further states that defense counsel should have filed a motion to suppress evidence prior to trial. During the pretrial discussion on February 18, Lawson argued that the drugs were not lawfully found as part of the execution of a search warrant on an arson investigation out of Montgomery County. In response, the prosecutor stated, "Your Honor, that would have been an appropriate Motion to Suppress. None has been made. They've waived that issue at this point." Defense counsel stated, "* * * [T]hat was one of the Motions to Suppress we were talking about."

{¶ 111} "The failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful if made." *State v. Wallace-Lee*, 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 53. The State did not offer the search warrant as an exhibit at trial, and it is not in the record. Consequently, we cannot determine, on this record, whether a motion to suppress the guns and drugs located based on the search warrant would have been successful. Moreover, upon consideration of the evidence presented at trial, we find no basis to conclude that a motion to suppress the guns and drugs otherwise would have been successful.

{¶ 112} Lawson further claims that defense counsel acted deficiently by failing to file a motion in limine regarding other pending criminal investigations in which Lawson was a suspect. (A motion in limine is a pretrial motion that asks a trial court to limit or exclude the use of evidence which the movant believes to be improper. *See Feight v. Brooks*, 2d Dist. Montgomery No. 28684, 2020-Ohio-5205, ¶ 27.) Lawson also asserts that counsel should have objected to testimony about those investigations at trial.

{¶ 113} The record does not support a conclusion that Lawson was prejudiced by the absence of a motion in limine or that counsel acted deficiently at trial with respect to evidence of other criminal investigations. The State's references to other criminal investigations involving Lawson were kept to the bare essentials, namely that deputies located Lawson as part of an unrelated investigation and that the Riverside police department wanted to have Lawson's vehicle towed as part of an investigation. The State did not attempt to elicit testimony about the criminal offenses involved in those investigations or about the course of those other investigations.

{¶ 114} The only reference to the nature of the Riverside investigation occurred during Todd's testimony. At the beginning of Todd's testimony, the State asked him why he had come into contact with Deputies Davis and Major. Todd began to answer, "There was an arson that had occurred at --." The prosecutor cut off Todd's answer, saying, "Well, I'm going to stop you there." Defense counsel also started to object, stating, "Objection. Okay. I'm sorry. You got it." The prosecutor then asked Todd if he had to respond to the Huber Mobile Home Park, telling him to answer "without saying specifically why you were responding." (Trial Tr. at 217.) No other references were made by the State's witnesses about the specifics of the unrelated Greene County or

Riverside investigations.

{¶ 115} During redirect examination of Todd, the prosecutor asked him if he had received any information that the vehicle Lawson was driving was stolen. Defense counsel objected to that question, and the trial court sustained the objection. (Trial Tr. at 236.) Upon review of the trial transcript, defense counsel did not act deficiently with respect to evidence regarding other criminal investigations.

{¶ 116} Lawson raises that his trial counsel stated that he would not be as prepared for trial as he normally would be. We cannot conclude, based on this statement alone, that defense counsel was so unprepared that he failed to provide effective assistance as contemplated by the Sixth Amendment. Counsel told the trial court on February 7 that he would do his best to prepare for trial in the time available, and we find nothing to suggest that defense counsel did otherwise.

{¶ 117} In addition, defense counsel developed a defense theory based on the time that the Altima was left unattended by law enforcement officers and a discrepancy between the amount of drugs found in the vehicle and the amount that Lawson had said would be there. Counsel cross-examined the State's witnesses to elicit testimony to support that defense theory. Specifically, defense counsel elicited testimony that Deputies Davis and Major were not certain if Lawson's vehicle was locked when they left the scene, that the vehicle was unattended when Officer Todd arrived, and that Officer Todd did not know if the vehicle was locked. As for the amount of drugs involved, Captain Magoteaux indicated that 77 grams (the approximate amount of drugs located in the Nissan) equals 2.7161 ounces. Magoteaux acknowledged on cross-examination that the difference between 2 ounces (or 56.7 grams), the amount Lawson said would be

found in the vehicle, and 2.7 ounces (77 grams) was around 30 percent of the amount, which could be significant. Finally, we note that the jury could not reach a verdict on Count One and that charge was dismissed. We cannot conclude, on this record, that counsel failed to prepare adequately for trial.

{¶ 118} Lawson further asserts that counsel rendered ineffective assistance by failing to object to the prosecutor's reference to ounces rather than grams and by misstating the amount of drugs involved due to an error in converting ounces to grams.

{¶ 119} The prosecutor first mentioned "ounces" during opening statements. Specifically, the prosecutor stated:

> * * * When he [Detective Sewert] searched the car, he did, in fact,
> find guns and dope. About 68 ounces of Fentanyl. That's, yeah, pretty
> much OD everybody in this courthouse and this city.
>
> * * *
>
> The State through the testimonies of Detective Sewert and Detective
> Magoteaux, and our BCI scientist, Pamela Farley, are going to establish
> beyond a reasonable doubt that the items that were seized were 68 grams
> of Heroin and Fentanyl in one bag, 5.5 grams of Tramadol, Heroin, and
> Fentanyl in a second bag, and 3.6 of [sic] grams of Methamphetamine.
>
> * * *
>
> You're going to hear how 68 ounces is well beyond personal use.

That the only reason someone would have that is for trafficking purposes.
(Trial Tr. at 195-196.)

{¶ 120} During the State's redirect examination of Deputy Major, the prosecutor

again referenced ounces, asking, "In your experience as a law office – officer of the law, have you ever heard of a time when someone has abandoned 68 ounces of Fentanyl in a vehicle?" (Trial Tr. at 213.) The prosecutor asked the same question of Officer Todd on redirect examination, as well as similar questions regarding "5.5 ounces of a Heroin, Fentanyl, Tramadol mix" and "3.65 grams of crystal meth." (*Id.* at 237-238.)

{¶ 121} Defense counsel did not object to any of these references to ounces, and the State asserts that defense counsel's failure to object to these apparent misstatements was a matter of trial strategy. The State's opening statement was not evidence, and the prosecutor's use of both ounces and grams may have put the jury on notice that one of those units of measurement was incorrect. Defense counsel could have reasonably determined that the amount of drugs found in the vehicle would be clarified by way of testimony and an objection was unnecessary.

{¶ 122} The prosecutor again misspoke, using ounces instead of grams, during redirect examination. Again, defense counsel could have reasonably concluded that the jury was aware that the prosecutor had mistakenly used "ounces." Defense counsel addressed the matter directly in his cross-examination of Farley, the forensic scientist at BCI, when he asked: "Okay. And the second question is, there's been a lot of units thrown around today in terms of measurement. Everything that you've worked in, everything was in grams; correct?" Farley responded, "Correct." Defense counsel's approach was reasonable.

{¶ 123} Lawson claims that defense counsel rendered ineffective assistance in his questioning regarding the conversion of ounces to grams. During defense counsel's cross-examination of Detective Sewert, the following exchange occurred:

A: Yeah.   He [Lawson], he stated two – I think he stated two ounces is what we would find.

Q: That's correct.   Now, you mentioned that you work in drugs pretty – you have some experience working with drugs, correct?

A: Uh-huh, yes.

Q: And, in fact, you testified the importance of the scale?

A: Yes.

Q: So you're familiar with weights?

A: Yeah.

Q: How many ounces are in a gram?

A: I mean, I'm not a mathematician.   I don't know.

Q: Well, just simple conversions?

A: I don't know.

Q: It's around 0.035; correct?

A: I don't know.

Q: It's much smaller. In fact, on the street they generally use, what, they would generally say there's 28 times difference; correct?

A: I don't know

Q: Okay.   And well, let's, let's, let's assume that, that I'm – that I am correct; okay?   So we have approximately 28 times difference.   We have approximately 77 grams by the time we add up all three drugs that are of interest here.   So if we were to do that, we come out with over essentially 2,100 ounces.   He referred to two ounces, 0.07, so we're talking about that

being a mistake of over 3,000 times the difference in what that – the impression that that would leave; is that correct.

A: If you math is right, yes.

Q: Okay. And I think you would agree to me, that we need to be candid with the Jury about the amounts, correct, involved?

A: I – yeah, he, he stated two. What was recovered was the amount.

* * *

Q: * * * [In conducting the search of the vehicle,] you knew about this extremely small amount that he had told you about, the, the approximate 0.07 grams; correct?

A: I knew of the two ounces that he said, yes.

* * *

Q: You have this very, very small amount that you were just going, that you were going to rely on just your vision for. So, so I guess what I'm getting at, you don't know whether you might have missed somewhere else in the vehicle just that small 0.07 and that might have been the actual amount that he knew about as opposed to the 70 some odd grams?

A: A thorough search of the vehicle was done. I did not find any other, any other narcotics in the vehicle other than what was in the lunch pail.

(Trial Tr. at 395-399.)

{¶ 124} The State responded to defense counsel's questioning of Sewert regarding the conversion of ounces to grams through the testimony of Captain Magoteaux. The State asked:

Q: And you heard [defense counsel] give an explanation of the conversion of grams to ounces?

A: Correct.

Q: Do you believe that was a correct conversion?

A: No.

(Trial Tr. at 407.)   The prosecutor showed Magoteaux a document that gave an equation for converting grams to ounces (Exhibit 22).   Magoteaux testified that one gram equaled 0.353 ounces and that 77 grams, the approximate amount of drugs found in Lawson's vehicle, equaled 2.7161 ounces.   The State asked Magoteaux if Lawson's statement that Detective Sewert would find about two ounces of drugs was a correct statement. Magoteaux answered that it was.

**{¶ 125}** Defense counsel addressed his mistake during his cross-examination of Magoteaux.

Q: Okay.   I'll agree, I was incorrect.   I got the numbers flipped there.

A: Yes.

Q: But it still is, is somewhere around a third difference, correct, 2.7 versus two?

A: Yes.

Q: So it's, so it's still a pretty significant difference.   It's not like it was particularly close?

A: I don't know if it's a significant difference, but it, yes, there was a difference.

Q: Yeah.   And about 30 percent or so?

A: Yes.

Q: Okay.   So if you went to the bank, and they were going to give you 30 percent more money than what you had, you would take it; correct?

A: No, I wouldn't.

Q: Huh?

A: If they were going to give me the extra money?

Q: Yeah. No strings attached.

A: Well, Yeah.

Q: Exactly.   So 30 percent can be significant?

A: (Indicating.)

(Trial Tr. at 415-416.)

{¶ 126} Although defense counsel initially made a calculation error in his conversion of ounces to grams, we cannot conclude that this error rises to the level of ineffective assistance of counsel.   Even with the correction by Captain Magoteaux, defense counsel elicited testimony that the difference between two ounces (the amount Lawson had said would be found in the vehicle) and 2.7 ounces (the amount that was found) could have been a significant difference in quantity.   Defense counsel thus successfully elicited testimony to support an argument that Lawson did not knowingly possess all of the drugs found in the car.

{¶ 127} Finally, Lawson claims that defense counsel acted deficiently by failing to object to testimony by Captain Magoteaux that he recognized Lawson's voice in jail phone calls.[7]   Lawson emphasizes that the recordings of the phone calls were not offered into

---

[7] At trial, the prosecutor asked Magoteaux about "recorded phone calls"; there was no testimony that these calls were made from the jail.   The parties appear to agree, however, that these were recorded jail telephone calls.

evidence, there was no corroboration that the calls occurred, and there was no foundation laid as to how Magoteaux would have recognized Lawson's voice. Lawson also states that there was no evidence that defense counsel even knew about the calls, and Lawson states that the record does not show whether he (Lawson) had an opportunity to hear them.

{¶ 128} At the outset, we cannot conclude, on this record, that counsel's pretrial conduct with respect to the recordings was ineffective. The record indicates that the State's provided discovery to both Lawson's original counsel and to his substitute defense counsel. In February 2020, defense counsel indicated that he had several discs he needed to review. The record does not affirmatively show that defense counsel received and reviewed recordings of jail phone calls, but it also does not affirmatively show that he did not. Accordingly, any alleged ineffectiveness in this regard is more properly raised in a petition for post-conviction relief.

{¶ 129} Defense counsel's decision not to object to Magoteaux's testimony about the phone calls (apparently from jail) was a matter of trial strategy left to counsel's discretion. "Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116. It is unknown from this record whether Magoteaux would have been able to provide additional information about how he recognized Lawson's voice and whether that information would have been detrimental or beneficial to Lawson. Moreover, because the recordings themselves are not in the record, we have no basis to evaluate defense counsel's decision in light of the content of those recordings.

{¶ 130} Lawson's second assignment of error is overruled.

## IV. Conclusion

{¶ 131} The trial court's judgment will be affirmed.[8]

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Marcy A. Vonderwell
Jay A. Adams
Hon. Stephen Wolaver

---

[8] As stated in footnote one, above, Lawson's motion for judicial notice of his prior defense counsel's suspension from the practice of law is sustained.